Mark David JOHNSON, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–93–281.

Court of Criminal Appeals of Oklahoma.

Aug. 5, 1996.

As Corrected Aug. 22, 1996.

Rehearing Granted Dec. 24, 1996.

Gary L. Henry, Ardmore, Samson R. Buck, Ardmore, Defense Counsel, at trial.

Fred Collins, District Attorney, Ardmore, L. Jack Barton, First Assistant District Atty., Marietta, Prosecutors, at trial.

Carol A. Walker and Robert W. Jackson, Asst. Appellate Indigent Defenders, Norman, for Appellant on appeal.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for the State on appeal.

## OPINION

LANE, Judge:

Mark David Johnson, Appellant, was convicted by jury for the crime of malice aforethought First Degree Murder in violation of 21 O.S.1991, § 701.7(A) in Love County District Court Case No. CRF–91–46. The jury recommended the death sentence after finding two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel, and (2) there was a probability that the defendant would pose a continuing threat to society. *See* 21 O.S.1991, § 701.12(4), (7). The trial court sentenced accordingly. We affirm judgment and sentence.

### FACTS

Thirty-three year old Billy Webb lived with his mother in the Presidential Gardens apartment complex in Norman, Oklahoma. He had mental problems, and acted like a twelve or thirteen year old child. He played with the residents' children, took medication for his mental problems, and often behaved oddly. He stared at people and showed up on their patios and in their garages uninvited. People who knew him believed he was harmless. The apartment manager, Carol Lowe, knew him well, and gave him odd jobs around the complex.

On July 23, 1991 Mark David Johnson, who lived at the complex and worked there as the painter, told Lowe that if he thought Webb was going to hurt her children he would "take a baseball bat to him, pour gas on him and throw a match on him." Johnson had made a similar statement to Lowe's husband. The next day Johnson told several co-workers that if they couldn't do anything about Webb, he could.

The next evening Webb held the flashlight while one of the tenants and her boyfriend put mud flaps on her truck. When the job was done, Webb told them he was going to go out and party. He left in an orange and white Chevrolet pickup with Mark David Johnson and Rickey Masquat.[1] The next morning around 6:30 a.m. a motorist saw Webb standing naked in the middle of Putnam Road near Marietta in Love County. The motorist thought Webb was covered with mud. He called the Love County Sheriff, and Deputy Kenny Walker came to the site and heard Webb calling to him from tall grass by the side of the road. Webb was bleeding from a head wound, and his skin had been burned off. He told Walker that "Mark" hit him over the head with a baseball bat, and "Rickey" poured gasoline on him from a plastic jug and set him on fire. Webb also told him the men were headed to Dallas in a 1973 or 1974 orange and white Chevrolet pickup truck. Unknown to Deputy Walker, Johnson and Masquat had been contacted by the Highway Patrol earlier that morning as they walked away from their orange and white Chevrolet pickup that was stuck in the median of I–35 with a flat tire. The Trooper offered to call a wrecker, but when the men stated they wanted to call home, they were taken to the Chickasaw Trading Post. As a result of radio contact between the Sheriff's office and the Highway Patrol, Johnson and Masquat were arrested at the trading post.

The Trooper noticed blood on Johnson's sleeve and Johnson explained the blood came from the bloody nose he got when the truck hit the ditch. A bloody baseball bat, and a plastic jug with traces of gasoline was found in the bed of the truck. Forensic examination established the blood on the bat and shirt was consistent with Webb's blood. Johnson's shorts had gasoline on them. A plastic cap which fit the jug perfectly was found at the site where Webb was burned.

Webb lived for approximately seventeen hours after being burned. He was treated at the scene, at the Love County Health Center, at Ardmore Memorial Hospital, and at the Hillcrest Burn Center in Tulsa. He remained lucid until his death, his pain mini-

---

1. Masquat was tried separately, convicted and sentenced to life imprisonment without possibility of parole. Judgment and sentence was af-

firmed by unpublished opinion. *Masquat v. State,* (F–93–1369; July 26, 1996).

mized by the fact the nerves in his skin had been burned away. During this time he was able to communicate, for he rejected sedatives in the hope he would be able to talk with his mother before he died.

Webb told the paramedic who treated him at the scene, "Rick and Mark, my friends" had done this to him. When the paramedic asked why they did it, Webb replied, "They say I messed with some kids and I didn't do that." Webb told a Tulsa Police Detective the same thing he told Deputy Walker, Mark hit him with the bat and Rick soaked him with gasoline and set him on fire.

## I. JURY SELECTION

Appellant argues in his first proposition of error the trial court erred by failing to remove three veniremen for cause. Venireman Whiteley was passed for cause by the defendant, veniremen Miller–Reed and Robertson were challenged when each expressed the opinion that if the defendant was innocent he should take the stand. The trial judge denied these challenges, and the defense then struck these veniremen by peremptory challenge.

■ The State relies on *Plantz v. State,* 876 P.2d 268, 277 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1130, 130 L.Ed.2d 1091 (1995) to argue the defense waived any appellate argument regarding Whiteley when it passed her for cause at trial. We find *Plantz* controlling, and do not reach the merits of this argument which has not been preserved for our review.

After Miller–Reed and Robertson expressed their opinion that the defendant should testify if he was innocent, the trial court explained the defendant's Fifth Amendment right to silence, and admonished these veniremen they would be instructed not to consider the defendant's silence at all. When the trial judge asked if they could follow this law, they replied they could.

■ This Court will reverse the decision of a trial court regarding jury selection only if that decision rises to an abuse of discretion. *Id.* at 277. A trial judge commits an abuse of discretion when the judge's decision is not supported by the law or facts of the

case. *Walker v. State,* 780 P.2d 1181, 1183 (Okl.Cr.1989). Excusal for cause is justified when, among other things, a juror cannot try the issue impartially, and without prejudice to the substantial rights of the party challenging the juror. *See* 22 O.S.1991, § 659. When the two veniremen agreed to follow the law as set forth by the judge, they no longer prejudiced the substantial Fifth Amendment right of the defendant. Therefore, the trial court's decision to deny the challenge for cause is within the proper exercise of his discretion.

During voir dire the trial court asked prospective jurors:

If you find that the law and the evidence in this case warrants the recommendation of the death penalty could you vote to recommend that penalty?

■ The Appellant argues in his sixth proposition of error that by using the word "recommend", the trial court lessened the responsibility these jurors would feel, as they could conclude the appropriateness of the death sentence rested elsewhere. Such a result, he asserts, would violate the Eighth Amendment of the federal constitution. *See Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985).

This argument was rejected in *Romano v. State,* 847 P.2d 368 (Okl.Cr.1993), *affirmed,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). In *Romano* the trial court's use of the word, "recommend" in *voir dire* was not error where the proper and complete sentencing instructions were given in the second stage of trial. *Id.* at 390. Appellant tries to distinguish his case by arguing the fact the jury sent a note to the judge during deliberations asking whether life without parole meant the defendant would never be paroled. We find nothing in the post-sequestration communication that takes this case outside the reasoning of *Caldwell* or *Romano.* We address the correctness of the trial court's response to the jury below.

## II. FIRST STAGE OF TRIAL: GUILT–INNOCENCE

### A. EVIDENTIARY ISSUES

Appellant challenges the sufficiency of the evidence in his third and fifth propositions of

error. He asserts the State failed to prove beyond a reasonable doubt that he (1) intended the victim be killed; and (2) was a principal, even as an aider and abetter. Appellant bases this argument on the uncontroverted evidence that Masquat soaked the victim with gasoline and set him on fire. The State counters with *Van Woundenberg v. State*, 720 P.2d 328 (Okl.Cr.), *cert. denied* 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). In that case the accused helped plan the murder, acted as a lookout during the murder, and helped dispose of the body, but did not personally kill the victim. *Id.* at 333. This evidence was sufficient to prove malice aforethought.

■ The State introduced the following uncontroverted evidence. Three days before the murder Johnson said he would hit Webb with a baseball bat, soak him with gasoline and set him on fire if Webb hurt a child. As Johnson and Masquat attacked Webb, one of them told Webb he was being burned because he had harmed a child. Blood consistent with Webb's blood was found on Johnson's shirt; gasoline was found on his shorts. Johnson and Masquat were together when they picked Webb up in Norman, together during the attack, and together as they walked away from their mired truck.

■ We will apply this evidence first to the question of intent to kill. Malice aforethought, an element of murder in the first degree as charged in this case, is the deliberate intention to take away the life of a human being. 21 O.S.1991, § 701.7. This intent is manifest by external circumstances capable of proof. *Id.*

Both direct and circumstantial evidence of intent was introduced at trial. The direct evidence came from the Appellant's own mouth. Two days before the murder he told his apartment manager he would hit Webb with a baseball bat and burn him with gasoline if he hurt a child. The next day the Appellant assured the tenants he could take care of Webb. During the attack Johnson or Masquat told Webb he was being burned because he had "messed with" a child.

Circumstantial evidence of intent to kill comes from the massive extent of the burning itself. Together this evidence, viewed in the light most favorable to the prosecution, must allow any rational trier of fact to find intent to kill. *See Drew v. State*, 771 P.2d 224, 227 (Okl.Cr.1989). It does.

■ We now examine the evidence to determine if it is sufficient to prove Johnson was a principal, even as an aider and abetter. Citing *Mann v. State*, 749 P.2d 1151 (Okl. Cr.), *cert. denied*, 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988), the Appellant argues persuasively that in a malice murder case the State must prove the aider and abetter personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator. We agree this is the proper standard of proof.

■ We do not agree the evidence was insufficient to prove Johnson aided and abetted the commission of this crime. In the space of three days Johnson foretold how and why Webb would be killed, Johnson told tenants he could take care of the problems Webb caused, and while Webb was being attacked Johnson or Masquat told him the precise reason, articulated earlier by Johnson, for the attack. There is no doubt whatsoever that this Appellant personally intended that Webb die.

## B. *JURY INSTRUCTION*

Appellant raises two challenges to the first-stage instruction of the jury: (1) the instruction regarding aiding and abetting allowed the jury to convict without finding an intent to kill; and (2) the confusion created by the causation instruction amounts to plain error. We address these issues, raised in propositions of error two and four, in turn.

■ The Oklahoma Uniform Jury Instructions regarding aiding and abetting were given in this trial. *See* OUJI–CR 204, 205, 206, 207 and 208. Defense counsel did not object to these instructions, and thus waived all but plain error. *Munson v. State*, 758 P.2d 324, 332 (Okl.Cr.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989). Appellant argues these instructions allowed the jury to substitute the *general* criminal intent necessary to find aiding and

abetting for the *specific* intent to kill required to prove malice aforethought, an element of first degree murder.

 The instructions as a whole do not support this argument. The jury was clearly and correctly instructed on (1) the malice aforethought element of murder in the first degree, (2) the definition of malice aforethought as the deliberate intent to take a human life, and (3) the State's burden to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of malice aforethought. These instructions sharply channel the jury's discretion. While it could find the defendant aided and abetted in the murder by finding a design to commit the crime, it could convict for first degree murder only after finding a specific intent to kill beyond a reasonable doubt.

 The following instruction is challenged in the fourth proposition of error:

> No person may be convicted of Murder in the First Degree unless his conduct caused the death of the person allegedly killed. A death is caused by conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life.

Oklahoma Uniform Jury Instructions–Criminal 426. Appellant bases his challenge on the Commission Comment which advises this instruction is superfluous where the defendant does not dispute the cause of death but argues he is not the perpetrator. This issue clearly focuses the importance of the appellate court giving great deference to the discretion of the trial court in matters of jury instruction. *See Sellers v. State,* 809 P.2d 676, 685 (Okl.Cr.), *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Allison v. State,* 675 P.2d 142, 151 (Okl.Cr.1983).

Appellant does not dispute the evidence is sufficient to prove he hit Webb over the head with a baseball bat and caused a three inch gash. He based his defense on the fact Webb died from thermal injuries, not from the blow to the head, and *he* did not set Webb on fire. Because the evidence indicates Johnson and Masquat both participated in the murder, the trial court properly exercised its discretion by using an abundance of caution in instructing the jury on causation. We also note trial counsel was satisfied with this instruction and did not object. Only plain error thus is preserved for appellate review, and we find no error at all. *See Sellers,* 809 P.2d at 685.

## III. SECOND STAGE OF TRIAL: SENTENCING

### A. CONSTITUTIONALITY OF AGGRAVATING CIRCUMSTANCES

Appellant argues both aggravating circumstances found by the jury are unconstitutionally vague: (1) that the murder was especially heinous, atrocious and cruel; and (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1991, § 701.12(4), (7).

 In this jurisdiction it is well settled that the "heinous, atrocious or cruel" aggravating circumstance is not arbitrary or capricious, and does not run afoul of the Eighth Amendment of the federal constitution. *See Mayes v. State,* 887 P.2d 1288, 1319 (Okl.Cr. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *Williamson v. State,* 812 P.2d 384 (Okl.Cr.1991), *cert. denied,* 504 U.S. 968, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992); *Workman v. State,* 824 P.2d 378 (Okl.Cr.), *cert. denied,* 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1991); *Stouffer v. State,* 742 P.2d 562 (Okl.Cr.1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

 The "continuing threat" aggravating circumstance likewise has been determined not to be unconstitutionally vague. *See Snow v. State,* 876 P.2d 291 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Malone v. State,* 876 P.2d 707 (Okl.Cr.1994); *Allen v. State,* 871 P.2d 79 (Okl.Cr.) *cert. denied,* —— U.S. ——, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994); *Woodruff v. State,* 846 P.2d 1124 (Okl.Cr.), *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); *Fox v. State,* 779 P.2d 562 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). We find no reason to revisit these issues.

■ Appellant challenges the constitutionality of the so-called "anti-sympathy" instruction in his thirteenth proposition of error. The trial court instructed the jury in the first-stage of trial, "You should not let sympathy, sentiment or prejudice enter into your deliberations." This instruction was incorporated into the second stage. The Appellant argues this instruction creates a reasonable likelihood that the jury refused to consider relevant mitigating evidence. The Appellant acknowledges the tide of case law is against him, but urges this Court to find guidance in the dissent of *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) rather than the majority opinion. We consistently reject this challenge, and again find the anti-sympathy instruction does not mislead the jury into ignoring mitigating evidence. *See Harjo v. State*, 882 P.2d 1067, 1079 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995); *Fisher v. State*, 845 P.2d 1272, 1277 (Okl.Cr.), *cert. denied*, 509 U.S. 911, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1992); *Stiles v. State*, 829 P.2d 984, 994–95 (Okl.Cr.1992); *Fox*, 779 P.2d at 574–75.

## B. INSTRUCTION ON THE USE OF MITIGATING EVIDENCE

■ Appellant raises three other issues in the thirteenth proposition of error regarding instruction on the use of mitigating evidence. He argues that by instructing the jury that mitigating circumstances are those which in fairness and mercy *may* be considered as extenuating or reducing the degree of moral culpability or blame, the trial court allowed the jury to ignore mitigation evidence at its discretion. This argument has been rejected repeatedly by this Court, and we find no reason to revisit it. *See Mayes*, 887 P.2d at 1319–1320; *Harjo*, 882 P.2d at 1081–1082; *Williamson*, 812 P.2d at 409.

■ Next, Appellant argues the trial court erred by failing to instruct the jury it was not required to be unanimous in its findings of mitigating circumstances. This argument is also consistently rejected by this Court. *McGregor v. State*, 885 P.2d 1366 (Okl.Cr.1994); *Pickens v. State*, 850 P.2d 328 (Okl.Cr.1993), *cert. denied*, 510 U.S. 1100, 114

S.Ct. 942, 127 L.Ed.2d 232 (1994); *Castro v. State*, 844 P.2d 159 (Okl.Cr.1992), *cert. denied*, 510 U.S. 844, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Clayton v. State*, 840 P.2d 18 (Okl.Cr.1992), *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Stiles*, 829 P.2d at 997.

■ Finally, the Appellant challenges the so-called "weighing" instruction in which the trial court instructed the jury it·must find the aggravating circumstances beyond a reasonable doubt, and that it was authorized to impose the death penalty if the aggravating circumstances outweighed the mitigating evidence. Again, we find no reason to revisit this issue which is rejected consistently by this Court. *See Walker v. State*, 887 P.2d 301, 323 (Okl.Cr.1994); *Thomas v. State*, 811 P.2d 1337, 1351 (Okl.Cr.), *cert. denied*, 502 U.S. 1041, 112 S.Ct. 895, 116 L.Ed.2d 798 (1991).

## C. SUFFICIENCY OF THE EVIDENCE TO PROVE CONTINUING THREAT

Appellant argues the only evidence supporting the continuing threat aggravating circumstance is his "relatively minor role" of hitting the victim with the baseball bat, hostile statements he made about the victim prior to the murder, and two domestic disturbances between the Appellant and his wife.

■ The most compelling evidence supporting continuing threat comes from the facts surrounding the murder itself. The Appellant announced he would take the law into his own hands and murder Webb in a most cruel way if Webb hurt a child. Appellant then decided to burn Webb anyway, even though Webb had not hurt a child. The Appellant demonstrated he could "take care of" people he did not like by inflicting, what one medical witnesses called, the worst possible kind of pain.

■ This Court has recognized that a defendant's attitude is an important factor in the determination of future dangerousness. *Snow*, 876 P.2d at 298. A person who acts with utter disregard for human life is likely to do so again. *See Id.; Fisher v. State*, 736 P.2d 1003 (Okl.Cr.1987), *cert. denied*, 486

U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988). The record presents a number of incidents which reveal Mr. Johnson's attitude. Before carrying out the Webb murder the Appellant had threatened to hit his wife over the head with a baseball bat and burn her with gasoline. The record indicates Mr. Johnson's threats against Webb began after an incident in which he thought Webb had made a homosexual pass at him. Mr. Johnson's statements to the apartment manager and her husband, and tenants that he could "take care of" Webb indicate he acted as a vigilante, dishing out his own brand of justice. His extremely cruel action proves beyond a reasonable doubt an utter disregard for human life, and a probability that he would commit criminal acts of violence in the future which would constitute a continuing threat to society.

### D. USE OF NON–STANDARD LIMITING LANGUAGE

The trial court instructed the jury on the "heinous, atrocious or cruel" aggravating circumstance with a non-standard limiting paragraph. Following *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987), when trial courts instruct on this aggravating circumstance, the following paragraph is to be used:

> The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or *serious physical abuse*. (emphasis added)

OUJI–CR 436; *see, Foster v. State*, 779 P.2d 591, 593 (Okl.Cr.1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3293, 111 L.Ed.2d 801 (1990); *Battenfield v. State*, 816 P.2d 555, 565 (Okl. Cr.1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

The trial court in this case omitted the word "physical" from the last phrase of the limiting paragraph. The trial court thus instructed the jury the aggravating circumstance was directed to those crimes where the death of the victim was preceded by torture of the victim or "serious abuse". This, the Appellant argues in his eleventh proposition of error, requires reversal for it "dramatically lessened" the standard of proof required for the jury to find this aggravator.

The State counters with a three-fold argument: (1) the defendant did not object to this instruction and has thus waived all but plain error, (2) the evidence was sufficient to support the "torture" prong of the limiting paragraph, thus the error is harmless; and (3) this Court can apply the proper narrowing construction and find the evidence sufficient to support it. ·

■ The Appellant's failure to object at trial does waive all but plain error. *Munson*, 758 P.2d at 332. In this sensitive area of capital sentencing, we are constrained to find deviation from the well-established and constitutionally· firm instruction is error. We are not persuaded, however, that the error dramatically lessened, or indeed lessened *at all* the standard of proof which the jury had to apply to find this aggravator.

■ From a practical semantic standpoint, when we compare the phrase "serious physical abuse", with the phrase "serious abuse", we find the term "physical" does not address the degree of suffering required to satisfy the limitation. Rather, it addresses the type of harm which may satisfy this aggravating circumstance. In contrast, the degree of suffering is addressed by both of the words which frame it. The harm must be both *serious* and rise to the level of *abuse*. Those words control the standard of proof, and they were given to the jury intact. We thus distinguish the case before us from *Pickens v. State*, 885 P.2d 678 (Okl.Cr.1994) in which the Court found the use of the limiting phrase, "torture or serious physical harm", in concert with other errors, to require reversal. *Id.* at 684.

This error is serious, and we must admonish the trial bench across the state to vigilantly guard against straying from the constitutional standard in capital sentencing. However, we find beyond a reasonable doubt that it is harmless, for it did not alter the standard of proof, and thus could have had no impact on the sentencing decision. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

## E. *TRIAL COURT FAILURE TO GIVE TRIGGER–MAN INSTRUCTION SUA SPONTE*

In the third proposition of error the Appellant argues the trial court erred by failing to require the jury to make a finding of individual guilt prior to imposing the death sentence. This, Appellant argues, goes against the principle of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The State responds that the so-called "triggerman" instruction is appropriate only in felony murder cases when warranted by the evidence, and the jury was required to consider Appellant's participation by the mitigating instruction which stated the defendant was a follower and not a leader.

Appellant bases his argument on his belief the jury was not properly instructed that they had to find he personally had malice aforethought in order to find him guilty in the first stage of trial. As we have found the jury was properly instructed in this regard, we need not examine this issue further.

## F. *TRIAL COURT'S RESPONSE TO THE JURY QUESTION ON THE MEANING OF "LIFE WITHOUT PAROLE"*

Appellant challenges the trial court's response to the jury's question on the meaning of "life without parole" in his seventh proposition of error. The jury sent the following note to the trial judge during deliberations:

We need to know! Is life without parole firm—Does it mean he can *never* be paroled?

(Court's Exhibit # 2). The trial court responded, over defense objection:

It is inappropriate for you to consider the question asked.

Defense counsel wanted the trial court to respond:

You have received all that you're going to receive in this matter.

The trial court rejected this response, stating parole was not "appropriate for the jury to be considering." Appellant argues this was error, for under the amendment to 21 O.S.Supp.1987, §§ 701.9 and 701.10, it is the province and indeed the duty for the jury to consider whether a defendant will be eligible for parole if he receives a non-capital sentence.

The State counters with two non-capital cases, *Suits v. State,* 507 P.2d 1260 (Okl.Cr. 1973) (reversed when judge responded substantively to the jury question when would the defendant be eligible for parole) and *Jones v. State,* 764 P.2d 914 (Okl.Cr.1988) (approved response, "Your question cannot be answered by this court. This is not a matter for you to consider.") Neither case addresses the issue before us, for in a capital case the jury must compare the options of life, life without possibility of parole and death.

This Court has addressed this issue in three capital cases, *Mayes v. State,* 887 P.2d 1288 (Okl.Cr.1994); *McCracken v. State,* 887 P.2d 323 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); and *McGregor v. State,* 885 P.2d 1366 (Okl. Cr.1994). In *Mayes* the jury sent out a note from deliberations asking, "if life without parole was given was there ever a possibility of release from prison". 887 P.2d at 1316. The trial judge responded saying the instructions were self-explanatory. This Court resolved the issue saying:

Therefore, while we hold a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, we also hold there is no requirement for a trial judge to explain the Oklahoma parole process to a jury.

*Id.* at 1318. The *McCracken* jury sent out a note asking, "Does Life without Parole mean exactly that? *He would never* under any circumstances, get out of prison?" (emphasis in original). The trial court responded,

I will instruct you again to look at your instructions. The law in Oklahoma provides a person convicted of Murder in the First Degree is punishable by death, by life without parole or life. You may retire and deliberate further.

887 P.2d at 334. In this case the Court held the instructions were self explanatory, and

the trial court did not err by refusing a defense instruction setting forth Article VI, Section 10 of the state constitution which prohibits the governor from granting parole to a person who receives a sentence of life without parole. *Id.*

In *McGregor* the trial court did not respond to the jury's question "about what would happen to McGregor if he were sentenced to life without parole." 885 P.2d at 1383. This Court relied on *Mayes* to find no plain error.

 The case before us presents a different facet of this argument. Over defense objection the trial court told the jury it was not appropriate for it to consider whether the defendant could *"never* be paroled". This is a misstatement of law, for as *Mayes* makes clear, the jury must consider the distinctions between life, life without parole and death as it reaches the sentencing decision. 887 P.2d at 316–18. The trial court's response to the jury is error. We must, therefore, determine whether this error requires reversal.

 Misinstruction of the jury may be found harmless. *See Carella v. California,* 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (instruction with erroneous conclusive presumption); *Pope v. Illinois,* 481 U.S. 497, 501, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987) (misinstruction on elements of offense). The error may be deemed harmless only if we find beyond a reasonable doubt that it did not affect the jury's decision to impose the death penalty. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

 *McCracken, McGregor,* and *Mayes* make clear that in this jurisdiction the jury is not to be told of the inner workings of the parole system, even when it must compare two life sentences: one with the possibility of parole, and one without the possibility of parole. In none of these cases did the trial judge give a responsive answer to the jury's question. Likewise, the judge's answer in this case was non-responsive. The ultimate effect of all of these responses was to force the jurors back to the plain language of the instructions. From the standpoint of what the jurors must do following the trial

judge's response, we find no meaningful behavioral difference flowing from the approved responses in *McCracken, McGregor,* and *Mayes* which could be summarized as, "I am not going to answer that question", and the response in the case before us which could be summarized as, "Don't ask." We therefore find the trial judge's response in this case to be harmless beyond a reasonable doubt.

Having said that, we also believe the plain language of the jury instruction may be modified to provide greater clarity. We therefore approve, but do not require, the following modification to the second paragraph of Oklahoma Uniform Jury Instruction—Criminal 432:

Under the law of the State of Oklahoma, every person found guilty of murder in the first degree shall be punished by death, or imprisonment for life without the possibility of parole, or imprisonment for life with the possibility of parole.

## IV. *PROSECUTORIAL MISCONDUCT*

The Appellant cites two instances of alleged prosecutorial misconduct in his ninth proposition of error, one during *voir dire* and the other in the second-stage. Neither of these comments was objected to at trial, and thus all but fundamental error is waived. *Clayton v. State,* 840 P.2d 18, 29 (Okl.Cr. 1992), *cert. denied,* 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993). The appellant recognizes this obstacle, and argues the comments were so prejudicial that fundamental fairness was denied him.

 When using his peremptory challenges to excuse two veniremen who had expressed reservations about the death penalty, the prosecutor stated, "I do no want to do violence to [the venireman's] conscience, so I'll excuse [her]." Appellant claims this telegraphed a subtle message to the venire pool that the death penalty was inevitable.

These statements were unnecessary, for no reason need be given for a peremptory strike, unless the opponent challenges the strike on Equal protection grounds under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *See,* 22 O.S.1991,

§ 654. However, this admittedly subtle message is so subtle that this Court fails to discern it. We find no error here.

In the second-stage closing argument the prosecutor told the jury that the defendant's organic brain damage and alcoholism, two mitigating factors listed by the court in its instructions, were "really things that count against the defendant in this case." Appellant relies on *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) to argue this violated his right under Eighth and Fourteenth Amendment to have his mental retardation considered as mitigating evidence. The State counters with *Nguyen v. State*, 769 P.2d 167 (Okl.Cr.), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989); and *Burrows v. State*, 640 P.2d 533 (Okl.Cr.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983) to argue the State may use any evidence as well as reasonable inferences therefrom in its closing argument.

██ We find *Penry* is not controlling for in that case the jury was prohibited from considering the defendant's mental retardation which was offered as mitigation. 492 U.S. at 320, 109 S.Ct. at 2947. The Appellant's jury was not prohibited from considering his reduced mental capacity, and the prosecutor was well within the bounds of fair argument to comment on the weight of the mitigation evidence from the State's perspective.

## V. *MANDATORY SENTENCE REVIEW*

██ Pursuant to Title 21 O.S.1991, § 701.13(C), this Court shall determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1991, § 701.12. After reviewing the entire record on appeal we find no trial error infected the jury's deliberations with passion, prejudice or other arbitrary factor. The evidence is sufficient to support the finding by the jury of two statutory aggravating circum-

stances: (1) that the murder was especially heinous, atrocious or cruel; and (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1991, § 701.12(4)(7). Judgment and Sentence is **AFFIRMED.**

JOHNSON, P.J., and STRUBHAR, J., concur.

CHAPEL, V.P.J., specially concurs.

LUMPKIN, J., concurs in results.

CHAPEL, Vice Presiding Judge, specially concurring:

We continue to see case after case where the jury sends a note to the trial judge during deliberations inquiring about the possibility of parole. The reason why jurors repeatedly ask this question is because they are confused. They want, need, and deserve an answer. I continue to believe we should fashion an instruction which clarifies this issue for the jury.[1] I am concerned about the ramifications of our failure to do so since it seems clear to me that some jurors may be voting for a death sentence only because they believe that life without parole really does not mean life without parole.

I therefore concur based on stare decisis.

LUMPKIN, Judge, concurring in results.

I concur in the result reached in this case; however, because I find some language which could be misleading, I cannot join entirely in the opinion.

Capital cases today receive a degree of scrutiny unprecedented in our history. A carelessly chosen or misplaced word or phrase can be taken out of context and create issues where none existed before. It is because of this I cannot join in the statement the failure to utilize a particular OUJI–CR instruction is "serious," yet harmless beyond a reasonable doubt. *Ante* at page 318. Are there some errors which are "serious" yet harmless, while other "serious" errors are not harmless? Are there errors which are

---

1. See Chapel dissent in *Mayes v. State*, 887 P.2d 1288, 1324–25 (Okl.Cr.1994) or *McGregor v.* *State*, 885 P.2d 1366, 1383 (Okl.Cr.1994) where I discuss this issue.

not "serious" which are not harmless? The phrase used here adds nothing but confusion, and the entire paragraph implies there is an error of constitutional magnitude. I find none.

It is because of these potential "time bombs" I cannot join wholeheartedly in this otherwise well-reasoned opinion. I also once again urge this Court to adopt a unified *Spuehler*-type approach to evaluating both direct and circumstantial evidence. *See White v. State,* 900 P.2d 982, 993–95 (Okl.Cr. 1995) (Lumpkin, J., Specially Concurring).