**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 19 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HOLLY GRACE WINGFIELD,

      Petitioner - Appellee,

v.

NEVILLE MASSIE, Warden, Mabel
Bassett Correctional Center,

      Respondent - Appellant.

No. 97-5020

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 96-C-255-K)**

---

Gloyd L. McCoy of Oklahoma City, OK (J. W. Coyle, III, of Oklahoma City, OK,
with him on brief) for Petitioner - Appellee.

Alecia A. George, Assistant Attorney General of Oklahoma, for Respondent -
Appellant.

---

Before **ANDERSON, BALDOCK,** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Respondent-Appellant Neville Massie, as Warden of the Mabel Bassett Correctional Center (the "State"), appeals the district court's grant of a writ of habeas corpus to Petitioner-Appellee Holly Wingfield ("Petitioner" or "Holly"). The district court granted the writ after determining that Petitioner had been convicted of murdering her eighteen-month old sister, Crete, upon constitutionally insufficient evidence. We granted the State's application for a stay of the district court order pending this appeal, and we now exercise jurisdiction under 28 U.S.C. § 1291 (1994) and reverse.[1]

## BACKGROUND

On the morning of August 23, 1987, Clint and Louise Wingfield left their home in rural Craig County, Oklahoma, to attend worship services at their church. Clint and Louis took their eighteen-month old daughter, Crete, with them, but left their eighteen-year old son, Ty, and their sixteen-year old daughter, Holly, at home. While their parents were at church, Ty and Holly drove one of the family's cars to Miami, Oklahoma, in search of Valium and alcohol. Their search was successful, allowing Ty to consume twenty-three Valium pills and the majority of

---

[1] We note that Holly filed her habeas petition in the district court on April 3, 1996, three weeks prior to the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214. Thus, AEDPA does not apply to this action. See Lindh v. Murphy, 117 S.Ct. 2059, 2068 (1997).

a six-pack of beer.  Holly took two Valium pills and consumed three beers.  The night before Ty had also taken 50 Valium pills, injected several doses of methamphetamine into his body with a needle, and smoked large quantities of marihuana.

Also on Sunday morning, Ty noticed that his parents had locked the telephone in their room so that it could not be used.  Ty was so angry about this that he kicked in the door to access the phone.  When Clint, Louise, and Crete returned home, an argument ensued about the door.  Ty explained that he broke the door so that Holly could use the phone to make arrangements to go to the lake.  Clint then told Holly she was not allowed to go to the lake or anywhere else.

During this argument, Ty obtained a rifle from the hall closet and confronted Clint with it.  After declaring that he would not undergo drug rehabilitation, as Clint had commanded a couple of days before, Ty shot Clint with the rifle.  Holly grabbed Crete and took her into the living room after hearing the shot.  Holly then returned to her parents' bedroom, where she saw Ty shoot Louise.  She also observed Ty hit Clint twice on the head with a steel bat, apparently because he was still alive after the initial gun shot wound.

Thirty minutes later, when Holly was getting Crete something to drink in the kitchen, Ty called for Crete.  Holly told Crete to "go to Ty," and Ty then shot Crete with the rifle.  Holly then placed Crete in a plastic bag, and helped Ty place

the three bodies in the family pickup truck. While Ty took the bodies to the dump, Holly attempted to clean up all the blood that was in the house. She also gathered some valuables, and forged two checks to Ty. When Ty returned from the dump, the two fled to Texas in separate vehicles. Ty drove the family truck, and Holly drove the family van with the plan that the van be sold for drug money. Ty and Holly planned to meet in Hawsville, Texas, at the home of Joy Mauldin, the mother of Ty's ex-girlfriend.

Late that night, Holly got lost in Paris, Texas, and went to the police station to ask for directions to Hawsville. Ty had arrived at Mauldin's house at 3:30 a.m., and had informed Mauldin of the murders. Mauldin then called the local police, who came to Mauldin's house to arrest Ty. Holly showed up at the Mauldin house at around 6:30 a.m., at which time she was taken by law enforcement to Marshall, Texas for questioning. She was ultimately arrested for her involvement in the murders.

Although Holly was sixteen at the time of the murders, she was charged as an adult under Oklahoma's Reverse Certification procedure for the murders of Clint, Louise, and Crete. At trial, the State sought to convict Holly under an aiding and abetting theory, as Ty had already pled guilty as the principal for all three murders. The State relied predominantly upon the trial testimony of three figures to show that Holly had aided and abetted Ty in the murders: Ty Wingfield,

Joy Mauldin, and Sally Randall, Holly's second cousin. The state also relied upon Holly's own affidavit, which was produced the day after the murders during an interview with Texas law enforcement.

Ty testified at trial that prior to the day of the murders Holly had suggested to him on several occasions that they kill Clint, Louise, and Crete. Ty recounted that Holly was particularly frustrated with living at home on the day of the murders and that that morning Holly suggested to him that they kill their family when they got back from church, take the van, and leave. Ty also testified that when he went to retrieve the rifle he used to commit the murders from a closet, Holly encouraged him by asking "are you really gonna do it this time?," and then repeatedly saying "are you gonna do it, are you gonna do it." Ty testified that at one point when he and Louise were struggling over the rifle, Holly hit Louise on the back of the head with a steel baseball bat. Ty also confirmed that after the murders, Holly put Crete's body in a plastic bag and helped him load all three bodies into the truck. Finally, Ty explained that Holly cleaned up the house and forged two checks to him from Clint's account before they fled to Texas.[2]

---

[2]At trial, Ty could not recall many of the events surrounding the murders. Thus, much of Ty's testimony came in through the State's refreshing of Ty's memory with testimony he had earlier given under oath at a preliminary hearing. Ty admitted to remembering his earlier testimony, and testified that such testimony was true.

Sally Randall testified at trial regarding a conversation she had with Holly in the Rogers County jail on February 14, 1988. Holly admitted to Randall that Ty had told her that he was going to kill Crete immediately before she told Crete to "go to Ty." Randall also explained that Holly showed no remorse when she recounted the details of the murders, including her placement of Crete in a bag to be taken to the dump.

Joy Mauldin testified at trial regarding various statements made by Holly on the night she arrived at her house. Mauldin testified that Holly expressed no emotion with regard to Crete's death. Additionally, Mauldin testified that Ty told her that "he told Holly that [he was] going to take the blame for everything and for [Holly] not to say anything."

Finally, the State relied upon Holly's own affidavit to show that Holly aided and abetted in the murders of Clint, Louise, and Crete. In that affidavit, produced the day after the murders, Holly declared that although she did not want Ty to kill Crete, she knew Ty was going to kill Crete when Crete left the kitchen because Ty told her he was going to kill her. Holly also admitted in the affidavit that she placed Crete in a plastic bag after the murders and helped Ty clean up.

After a lengthy deliberation with regard to this, and other, evidence, the jury convicted Holly of aiding and abetting in the murder of Crete, and acquitted her on the charges of aiding and abetting in the murders of Clyde and Louise.

Holly was then sentenced to life in prison.  The Oklahoma Court of Criminal

Appeals affirmed the conviction and sentence on August 17, 1994, by summary

opinion.  A petition for rehearing was subsequently denied.

On April 3, 1996, Holly filed a petition for a writ of habeas corpus in the

United States District Court for the Northern District of Oklahoma pursuant to 28

U.S.C. § 2254 (1994) (amended 1996).  On February 7, 1997, the district court

granted habeas relief on the grounds that Holly was convicted upon

constitutionally insufficient evidence.  We granted the State's motion for a

temporary stay of the district court order and expedited this appeal.  We now

exercise jurisdiction under 28 U.S.C. § 1291 (1994) and reverse.

## DISCUSSION

"A district court decision setting aside a jury verdict of guilty is entitled to

no deference on appeal, and we review that determination *de novo*." United

States v. Santistevan, 39 F.3d 250, 255 (10th Cir. 1994) (citations and quote

marks omitted).  The standard of review, as enunciated by the Supreme Court, is

"whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

(1979) (emphasis in original).  This standard "gives full play to the responsibility

of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts."

Id. We have emphasized that, under Jackson, our "review is 'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Wright v. West, 505 U.S. 277, 296-97 (1992)).

In evaluating the evidence presented at trial, we are not to weigh conflicting evidence or consider witness credibility. Id. Instead, we must view the evidence in the "light most favorable to the prosecution," Jackson, 319 U.S. at 319, and "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1987). On the other hand, we can only affirm the conviction if the evidence supporting the conviction is "substantial" and does "more than raise a mere suspicion of guilt." Beachum v. Tansy, 903 F.2d 1321, 1332 (10th Cir.), cert. denied, 498 U.S. 904 (1990).

In applying the Jackson standard, we look to Oklahoma law to determine the "substantive elements" of the relevant criminal offense. See 443 U.S. at 324 n.16. The Oklahoma first degree murder statute provides:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another

human being.  Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. Ann. tit. 21, § 701.7.A (West Supp. 1997).  Additionally, Oklahoma law provides that persons "concerned in the commission of crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." Okla. Stat. Ann. tit. 21, § 172 (West 1983).

The Oklahoma Court of Criminal Appeals has specified that in order to convict an aider and abetter as a principal in a first degree murder prosecution, the prosecution must prove: (1) that the defendant personally intended the death of the victim; and (2) that the defendant aided and abetted with full knowledge of the perpetrator's intent.  Johnson v. State, 928 P.2d 309, 315 (Okla. Crim. App. 1996), petition for cert. filed, (May 22, 1997).  Oklahoma has further elaborated on the range of conduct for which a conviction for aiding and abetting may be sustained, stating that "'[a]iding and abetting' involves acts, words or gestures encouraging the commission of the offense, either before or at the time of the offense." VanWoundenberg v. State, 720 P.2d 328, 333 (Okla. Crim. App.), cert. denied, 479 U.S. 956 (1986).  Moreover, "mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of

- 9 -

encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime." Turner v. State, 477 P.2d 76, 83 (Okla. Crim. App. 1970) (quotation omitted). Applying the evidence produced in this case to the elements of aiding and abetting as defined by the Oklahoma courts, we believe there was constitutionally sufficient evidence from which a rational jury could have found Holly guilty of aiding and abetting in the murder of her sister, Crete.

The district court conceded that the State had produced sufficient evidence concerning the second prong of Johnson -- that the defendant aided and abetted with full knowledge of the companion's intent to kill the victim. However, the district court granted Holly habeas relief after determining that the State produced insufficient evidence of the first prong of Johnson -- that the defendant personally intended the victim's death. We respectfully disagree.

Although "[t]he meaning of the word 'intent' in the criminal law has always been rather obscure," 1 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law, § 3.5, at 302 (1986), there are a few guideposts we can rely upon in our present inquiry. First, a jury is permitted to draw inferences of subjective intent from a defendant's objective acts. See Id. at 316-17. Thus, even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant "if [her] words and acts in the light of all the

circumstances make [her] explanation seem improbable." Id. at 318. Second, a jury is permitted to find that a defendant intends those consequences which he announces a desire to accomplish. See Johnson, 928 P.2d at 315 (finding that there was sufficient evidence that the defendant intended the death of a victim where the defendant announced prior to the death of the victim how and why he would kill the victim and where the defendant executed the murder in the announced manner).

Applying these guidelines, we believe there was sufficient evidence from which a reasonable jury could have inferred that Holly personally intended the death of Crete. First, Ty answered "yes" to the question, "Ty, prior to the time that your father and Louise and your little step sister were killed, was there any time that Holly talked to you about killing them?" (emphasis added). Although the reference to "them" might have been intended to refer only to Clint and Louise, the most obvious meaning of the word "them" in the context of this question includes Crete, and the jury could have found from this testimony that Holly had stated an intent to kill Crete before the murders occurred. Second, and most compelling, Holly admitted, through the testimony of Sally Randall, that Ty told her he was going to kill Crete and that she then told Crete to "go to Ty." The jury could have found that statement to Crete was direct involvement by Holly intending to cause Crete's death. Third, there was ample evidence that Holly

- 11 -

showed no remorse at the death of Crete and that she helped dispose of Crete's body. In conjunction with the other evidence, a jury could infer from Holly's lack of remorse that the killing of Crete was consistent with her intent and desires.

Despite this evidence, the district court found that there was "no evidence that Petitioner knowingly and intentionally intended the death of Crete." The district court noted that Holly "did not give Ty the shotgun, did not encourage him to shoot, or in any other obvious way assist him in shooting Crete." The district court found no significance in Ty's testimony that Holly had suggested to him the morning of the murders that they kill "them" after finding that Holly had only suggested that they kill the parents. The district court also observed that Holly testified in her affidavit that she told Ty not to kill Crete, and that her act of taking Crete into the kitchen during Ty's fight with his parents "seem[ed] to negate any inference of premeditation or deliberation on the part of [Holly] concerning Crete's death." Finally, the district court explained that the evidence of Holly's post-murder cooperation with Ty was not sufficient to convict her of aiding and abetting in the murder of Crete.

We agree with the district court that there are certain pieces of evidence in the record that could support a finding that Holly did not intend the death of Crete. However, we have explained that when a record allows for conflicting findings, we "must presume . . . that the trier of fact resolved any such conflicts

in favor of the prosecution. . . ." <u>Messer</u>, 74 F.3d at 1013 (quotation omitted). Moreover, we review the record as a whole in an insufficiency challenge. <u>See</u> <u>Beachum</u>, 903 F.2d at 1332 (noting that we view "all of the evidence presented at the trial"). After viewing the evidence as a whole, and in the light most favorable to the prosecution, we believe a rational jury could have found that Holly intended the death of Crete, and thus, that Holly was guilty of aiding and abetting Ty in the murder of Crete.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of habeas corpus.