1998 OK CR 40

**Osbaldo A. TORRES, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–96–350.**

Court of Criminal Appeals of Oklahoma.

June 30, 1998.

Rehearing Denied Aug. 11, 1998.

6

Sharon Fore, Bethany, for Appellant at trial.

James A. Drummond, Sandra Mulhair Cinnamon, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

Robert Macy, District Attorney, Susan Caswell, Assistant District Attorney, Oklahoma City, for Appellee at trial.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, for Appellee on appeal.

CHAPEL, Presiding Judge.

¶ 1 Osbaldo A. Torres was tried jointly with George Ochoa by a jury in Oklahoma County District Court, Case No. CF–93–4302. The jury convicted Torres of two counts of First Degree Murder with Malice Aforethought, in violation of 21 O.S.1991, § 701.7, and one count of First Degree Burglary, in violation of 21 O.S.1991, § 1431.[1] At the conclusion of the capital sentencing phase of the trial, the jury found the existence of two aggravating circumstances: (1) there existed the probability that Torres would commit criminal acts of violence that would constitute a continuing threat to society,[2] and (2) Torres knowingly created a great risk of death to more than one person.[3] The jury recommended Torres be sentenced to death for both murders and to twenty (20) years imprisonment for burglary.[4] The Hon-

---

1. Ochoa was also convicted of two counts of first degree malice murder and burglary. *See Ochoa v. State*, 1998 OK CR 41, 963 P.2d 583 (Okl.Cr. 1998).

2. 21 O.S.1991, § 701.12(7).

3. 21 O.S.1991, § 701.12(2).

4. Ochoa was also sentenced to death for both murders and to twenty (20) years imprisonment for burglary.

orable Charles L. Owens sentenced Torres accordingly. Torres appealed his conviction and sentence to this Court.

### Facts

¶ 2 During the early morning hours of July 12, 1993, Francisco Morales and his wife, Maria Yanez, were shot and killed in the bedroom of their Oklahoma City home. The sound of gunfire woke Yanez's daughter Christina, who was 14 years old in the summer of 1993. Christina called 911 and told the operator that she believed her step-father, Morales, may have been firing the gun. After hanging up the telephone, she looked out her bedroom door. A light was on in the living room; Christina saw two men. One man was wearing a white t-shirt and the other man was wearing a black t-shirt. Christina stated the man in the black t-shirt had something in his hand, but she did not know what it was. Christina initially denied knowing the two men, but eventually identified Ochoa as the man in the black t-shirt and Torres as the man in the white t-shirt.

¶ 3 The shooting also awakened Christina's step-brother, Francisco, who was eleven years old in the summer of 1993. Francisco saw the man in the black t-shirt shoot his father. He could not identify the gunman.

¶ 4 The police quickly responded to Christina's 911 call. While en route to the Yanez/Morales home, Officer Coats arrested Torres and Ochoa, who were walking together a short distance from the homicide. The men were sweating and nervous, and Coats claimed he observed blood on the clothing of the men. Subsequent tests revealed the presence of blood on Torres' clothes.

¶ 5 Shortly before the shootings, Torres and Ochoa parked a car at a friend's house. A witness observed one of the men take a gun from the trunk of the car and put it in his pants. The gun was different from the gun used in the murders. The witness stated one of the men was Ochoa. She could not identify the other man, but asserted the other man—and not Ochoa—put the gun in his pants. Another witness also testified that Ochoa and another man parked the car at the friend's house. This witness testified that Ochoa was the driver of the car. The witness also identified Torres as the man with Ochoa, although she was somewhat inconsistent in her identification, and she stated the passenger was wearing a white t-shirt.

¶ 6 After the jury convicted Ochoa and Torres on all counts, the case proceeded to the capital sentencing phase of trial. The State argued Torres posed a continuing threat to society based on the circumstances of the murders, Torres' membership in the Southside Locos, a local gang, and an unadjudicated burglary committed when Torres was a juvenile. To show Torres created a risk of death to more than one person, the State offered the death of the two victims and the presence of three children in the home at the time of the murders. The defense presented in mitigation Torres' personal history and pleas of mercy from his family. The jury found the existence of both aggravating circumstances. After weighing the aggravating and mitigating evidence, the jury imposed the death penalty.

### Mistrial Transcript

■ ¶ 7 This case was originally tried in October 1995 and when the jury was unable to reach a verdict on guilt and innocence, the court declared a mistrial. Torres did not request the mistrial transcript be transcribed before the second trial. At the conclusion of the second trial, Torres' trial counsel filed a Notice of Intent to Appeal and a Designation of Record. The Designation of Record did not mention the mistrial and the court reporter did not transcribe it. Prior to filing his appeal brief, Torres' appellate counsel tried unsuccessfully to have the court reporter transcribe the mistrial.[5] Torres argues that error occurred in the appellate process because he did not receive a transcription of the mistrial. However, the reason Torres did not receive a transcription of the mistrial is because he failed to comply with this Court's rules in seeking the transcription.

---

5. See Torres v. Hodgen, O–96–839, Nov. 4, 1996 Order (Okl.Cr.) (Not for Publication); Torres v.

Hodgen, O–96–839, May 5, 1997 Order (Okl.Cr.) (Not for Publication).

¶ 8 On appeal, Torres argues that the language of the Designation of Record included the mistrial transcript and that the court reporter and the District Court should have assured that the mistrial was part of the record on appeal. A review of the record makes clear that trial counsel did not request the transcription of the mistrial for purposes of appeal. On page 3 of the Notice of Intent to Appeal, counsel indicated that the court reporter should be reimbursed for transcription of the jury trial held February 26, 1996 and the sentencing hearing held March 21, 1996. There is no mention anywhere of the mistrial. Attached to the Notice of Intent to Appeal is the Designation of Record. The Designation makes no mention of the mistrial transcript. When read in conjunction with the Notice of Intent to Appeal it is clear that the Designation of Record refers only to the trial that was conducted on March 21, 1996 and does not include the mistrial.

¶ 9 The Notice of Intent to Appeal also appoints the Oklahoma Indigent Defense System (OIDS) to represent Torres on appeal. This appointment was effective March 29, 1996, the date on which the trial court signed the Notice of Intent to Appeal and appointment of counsel. Under 22 O.S.1991, § 1362, Torres' OIDS appellate attorney was authorized "to supplement the designation of record as filed by the trial counsel by filing a written supplemental designation of record."[6] This Court's Rules provide that "[a]ny supplemental designation of record pursuant to Section 1362 of Title 22 must be filed within thirty (30) days of date of appointment."[7] Appellate counsel did not file a written supplemental designation of record within thirty days of appointment. When appellate counsel fails to file a supplemental designation of record within thirty days, Rule 2.1(B)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1996) provides that the "request to supplement the record shall be pursuant to Rule 3.11" of this Court's Rules.

¶ 10 Rule 3.11 of this Court's Rules allows a party to supplement the record on appeal only under specific, limited circumstances. First, a party may supplement the appellate record by motion "when it appears from the record that an item timely designated to be included in the record has been excluded."[8] This provision does not apply to Torres as trial counsel did not include the mistrial in her designation of record and appellate counsel did not file a written request for a supplementation of the record within thirty days of appointment.

¶ 11 Second, Rule 3.11(B)(2) provides in pertinent part:

> when a party files a motion to either amend the designation of record or counter designate a part of the record to include a transcript of any proceeding conducted by the trial court during the course of the trial court proceedings in this case or any item admitted as evidence by the trial court but not included in the original designation of record, the court may allow the amendment and direct the supplementation of the record with the item designated.

Under this subsection of Rule 3.11, Torres should have filed an amended Designation of Record with this Court. He did not. Instead, after the District Court advised Torres that the original Designation did not include transcription of the mistrial and that he would not order transcription of that proceeding absent some specific showing of need, Torres filed a writ of mandamus with this Court. A writ of mandamus was not the appropriate vehicle. Torres notes that he filed the writ of mandamus pursuant to Rule 2.4(B). However, Rule 2.4(B) concerns the responsibility of appellate counsel to assure timely and complete filing of the record on appeal. It is not the procedure to use to amend the Designation of Record. Rule 3.11(B)(2) requires Torres to file an amended Designation with this Court in order to acquire a transcript of the mistrial of proceedings. Since Torres did not file a motion to amend the Designation of Record with this

**6.** 22 O.S.1991, § 1362.

**7.** Rule 2.1(B)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1998).

**8.** Rule 3.11(B)(1), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1998).

Court, he has failed to comply with the requirements of Rule 3.11(B)(2).

¶ 12   Rule 3.11(B)(3) provides that supplementation of the record may be allowed in two other circumstances.   First, Rule 3.11(B)(3)(a) provides that supplementation may be allowed so as "to supplement the record on appeal with matters not presented to and included as a part of the District Court record ... [where] [m]atters [are] timely and properly admitted as a part of a motion for a new trial as set out in Sections 952 and 953 of Title 22 and Rule 2.1 of the Rules of the Court of Criminal Appeals."[9] Torres failed to timely file a motion for a new trial, therefore he cannot supplement the record under Rule 3.11(B)(3)(a).

¶ 13   Rule 3.11(B)(3)(b) offers the final avenue through which a litigant may supplement the record on appeal.   Rule 3.11(B)(3)(b) provides:

> When an allegation of the ineffective assistance of trial counsel is predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of the trial, and a proposition of error alleging ineffective assistance of trial counsel is raised in the brief-in-chief of appellant, appellate counsel may submit an application for an evidentiary hearing, together with affidavits setting out those items alleged to constitute ineffective assistance of trial counsel.   This Court will utilize the following procedure in adjudicating applications regarding ineffective assistance of trial counsel based on evidence not in the record:
>
> (i) In order to rebut the strong presumptions of regularity of trial proceedings and competency of trial counsel, the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence.

> (ii) If this Court determines such a strong possibility exists, it shall remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues raised in the application.
>
> (iii) Upon remand, the trial court shall conduct an evidentiary hearing within thirty (30) days from the date of remand.   In that hearing, the trial court shall make written findings of fact and conclusions of law to be submitted to this court within thirty (30) days of the evidentiary hearing. The findings of fact and conclusions of law shall determine the availability of the evidence or witness, the effect of the evidence or witness on the trial court proceedings; whether the failure to use a witness or item of evidence was trial strategy, and if the evidence or witness was cumulative or would have impacted the verdict rendered.
>
> (iv) The findings of fact and conclusions of law of the trial court shall be given strong deference by this Court in determining the proposition raised by appellate counsel; however, this Court shall determine the ultimate issue whether trial counsel was ineffective.
>
> (v) A supplemental brief may be filed by either party within fifteen (15) days after the trial court's written findings and conclusions are filed in this Court.   A supplemental brief shall be limited to ten (10) pages and shall address only issues concerning the record supplementation.   A request to exceed the page limitation must be filed in writing setting forth a specific basis for need.

Torres sought the mistrial transcript through two writs of mandamus, which this Court denied.   Torres has now filed an application for an evidentiary hearing but has failed to request in this motion that the record be supplemented with the mistrial transcript. However, in Propositions I and IX of his brief, Torres does claim trial counsel was ineffective at least in part because she failed to have the mistrial transcribed either before

**9.**   Rule   3.11(B)(3)(a),   *Rules   of   the   Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App.   (1998).

or after the second trial. Nonetheless, Torres has once again failed to avail himself of the proper procedures for obtaining the transcript or a hearing on the transcript. For these reasons, this proposition is denied.

### Peremptory Challenges

■ ¶ 14 In his second proposition of error, Torres argues the trial court erred in refusing to give him and Ochoa separate peremptory challenges. Section 655 of Title 22 provides, in pertinent part: "if two or more defendants are tried jointly they shall join in their challenges; provided, that when two or more defendants have inconsistent defenses they shall be granted separate challenges for each defendant as hereinafter set forth." Consistent with this statute, this Court has stated "when the defenses of codefendants are inconsistent, they should not be required to share peremptory challenges." [10] The Court has put some parameters on "inconsistent defenses." In *Neill v. State*, the Court stated "in some cases, the 'inconsistency' goes to the level of culpability while in other cases the 'inconsistency' goes to guilt or innocence. Where the issue is restricted to the level of each co-defendant's culpability, co-defendants may be required to share peremptory challenges." [11]

¶ 15 Torres and Ochoa did not have inconsistent defenses. The defense of both men was that they did not kill Yanez and Morales. Since Ochoa and Torres' defenses were not inconsistent, the court did not err in denying Torres' request for separate peremptory challenges.

### First Stage of Trial

■ ¶ 16 In his third proposition of error, Torres claims that the trial court arbitrarily refused to provide him with access to the crime scene. As discussed earlier, Ochoa and Torres' original trial ended in mistrial.

Before the second trial, Ochoa moved the trial court to order the person now living in the victims' house to allow his investigators into their home to investigate the crime scene. Apparently the person who was living in the Yanez/Morales home refused to allow defense investigators into the house. The trial court stated it was without authority to order a third party to allow defense investigators into the home and overruled the motion.

¶ 17 Shortly before the second trial, Ochoa learned that the prosecution intended to re-investigate the crime scene. The assistant district attorney agreed to permit defense investigators to accompany the State's investigators on their re-examination of the crime scene. Defense counsel sent a letter to the assistant district attorney confirming that his investigators would accompany the State investigators to the crime scene. In a handwritten note at the bottom of the letter, the assistant district attorney wrote:

> It is agreed that neither [defense investigators] will take photographs or measurements of the interior of the home or interfere w/ the technical investigator.[12]

According to Ochoa's counsel, the addendum was a last minute addition and was not part of the original deal. Ochoa's counsel stated that nonetheless they thought it better to go to the house with that condition than not to go at all. Ochoa's investigators accompanied the police and observed the investigation and measurements taken by the officers. Ochoa's investigators were not allowed an independent investigation and were not allowed to confirm the correctness of the police measurements. As a result of the new investigation, the prosecution produced a new diagram of the interior of the house that differed in certain respects from the diagram offered at the first trial. The trial court found the differences were minor.

**10.** *Woodruff v. State*, 825 P.2d 273, 276 (Okl.Cr. 1992). *See Neill v. State*, 827 P.2d 884, 891 (Okl.Cr.1992) ("co-defendants tried jointly who have inconsistent defenses shall be granted separate peremptory challenges"). The Constitution does not require that defendants tried together be granted separate peremptory challenges. *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919).

**11.** 827 P.2d at 891 (citing *Fox v. State*, 779 P.2d 562 (Okl.Cr.1989)); *Fowler v. State*, 779 P.2d 580 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990)).

**12.** Ochoa Vol. III O.R. at 521.

¶ 18  On appeal, Torres argues that the trial court erred by failing to order the State to allow the defense an independent investigation of the crime scene. However, Torres was not involved in the re-examination of the victims' home. Only Ochoa's investigators accompanied the State investigators to Yanez/Morales home, and the dispute over the investigation was between Ochoa's counsel and the district attorney. Moreover, Torres did not object to the use of the State's diagrams that were prepared after the re-examination of the Yanez/Morales home. Thus, we review Torres' claim for plain error only.

¶ 19  In support of his claim of error, Torres relies on *Brady v. Maryland* [13] and other cases addressing the State's withholding of exculpatory evidence. These cases are not on point because the State did not withhold exculpatory evidence from Torres. Rather, the question is whether the State's restrictions precluded Torres from putting on his defense thus depriving him of due process and a fair trial. In *People v. Davis,* [14] a New York trial court granted a motion to allow the defendant access to the crime scene and harshly criticized the district attorney for trying to limit the defendant's access to the scene. The court stated (1) the district attorney had no possessory interest in the property, (2) the district attorney had no statutory authority to limit defendant's access to the scene, and (3) any effort by the district attorney to do so was improper. In *Henshaw v. Commonwealth of Virginia,* [15] the defendant wished access to a crime scene which was in the possession of a third party. The court found that denial of access to the crime scene may deprive the defendant of due process and a fair trial. Relying on the state constitution, the court found the trial court should have ordered access to the crime scene, but the error was harmless. [16]

■  ¶ 20  Here, the restrictions the State placed on Ochoa's investigators are petty, unjustified and improper. The State contended that the restrictions were necessary to prevent interference with the State's investigation, but this argument is spurious. We are dismayed that the State would place such unnecessary and inappropriate barriers in front of a defendant's legitimate and proper attempt to prepare his defense. Nonetheless, Torres has failed to show that the restrictions placed on Ochoa's investigators curtailed his defense or deprived him of his right to due process. Although Torres indicates that the two diagrams of the Yanez/Morales home—the one used in the first trial and the one used in this trial—differ significantly from one another, he has not shown what these significant differences are or how they affected his defense. In contrast, the trial court noted that the differences were only slight. Torres has failed to show that plain error occurred and we deny relief. [17]

■  ¶ 21  In his fourth proposition of error, Torres argues his arrest is invalid because Officer Coats lacked probable cause to execute his warrantless arrest of Torres and Ochoa. Since Torres did not file a motion to quash the arrest or to suppress any evidence derived therefrom, we review for plain error.

¶ 22  This Court has stated, "The test for a valid warrantless arrest is whether—at the moment the arrest was made the officer had probable cause to make it whether at that moment the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant had committed or was commit-

13.  373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *State v. Munson,* 886 P.2d 999 (Okl.Cr.1994).

14.  169 Misc.2d 977, 647 N.Y.S.2d 392 (N.Y.Co. Ct.1996).

15.  19 Va.App. 338, 451 S.E.2d 415 (1994).

16.  Ochoa also cites *State v. Davenport,* 696 So.2d 999 (La.1997), which is simply a one sentence

order and we cannot determine how or why the court issued that particular order.

17.  In his third proposition, Torres briefly mentions that a second *Brady* violation occurred when Officer Goforth destroyed unusable latent fingerprints taken from the crime scene. This issue is examined in detail in our discussion of Torres' fifth proposition of error.

ting an offense."[18] Torres asserts that Officer Coats did not have a description of the defendants until after he arrested the men. However, a fair reading of the record below supports the trial court's conclusion that Officer Coats heard the description of the defendants over the radio prior to arresting them. Further, Coats testified the men were perspiring and there was blood on Torres' clothes. These factors support the trial court's conclusion that there was probable cause to arrest. This proposition is denied.

¶ 23 In Proposition V, Torres argues that the relief ought to be granted because the State destroyed latent fingerprints that were unusable but which might have contained sufficient ridge information to be of exculpatory value. In *Arizona v. Youngblood*,[19] the Supreme Court held "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[20] This Court adopted the *Youngblood* standard in *Hogan v. State*.[21] Torres has not shown that the State acted in bad faith when it destroyed the latent prints and relief is not warranted.

¶ 24 Torres also contends the trial court should have instructed the jury that they could draw a negative inference from Officer Goforth's destruction of fingerprint evidence. We disagree. Due process *does not* impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."[22] As stated earlier, unless a defendant can show bad faith by the police, destruction of potentially useful evidence does not constitute a

due process violation. We find, in the absence of a showing of bad faith, the failure of the trial court to provide an instruction allowing the jury to draw a negative inference from the destruction of evidence does not violate Torres' right to due process. However, such an instruction may be an appropriate sanction where the defense has made a showing of bad faith.

¶ 25 In Proposition VII, Torres argues that Officer Mullenix injected an evidentiary harpoon into the proceedings and expressed his opinion about the defendants' guilt. The testimony about which Torres complains arose during Ochoa's cross-examination of Mullenix. There was no objection to the comment[23] and we review for plain error.

¶ 26 This Court has defined evidentiary harpoons as follows: "(1) they are generally made by experienced police officers; (2) they are voluntary statements; (3) they are willfully jabbed rather than inadvertent; (4) they inject information indicating other crimes; (5) they are calculated to prejudice the defendant; and (6) they are prejudicial to the rights of the defendant on trial."[24] Contrary to Torres' claims, Officer Mullenix's comment was a legitimate response to cross-examination questions posed by Ochoa's counsel. Moreover, Mullenix did not introduce information of other crimes; he simply indicated that he did not pursue another suspect in this case because he believed the police had arrested the right men. The officer's testimony is not an evidentiary harpoon under our case law. Moreover, the officer's testimony that he believed he had " the right suspects" was invited by and made in response to a question by Ochoa's counsel.

---

18. *Castellano v. State*, 585 P.2d 361, 365–66 (Okl. Cr.1978). *See* 22 O.S.1991, § 196 ("A peace officer may, without a warrant, arrest a person ... [w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it").

19. 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

20. *Id.* at 58, 109 S.Ct. at 334.

21. 877 P.2d 1157, 1161 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995).

22. *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337 (1988).

23. *Odum v. State*, 651 P.2d 703, 705 (Okl.Cr. 1982) ("unless objection is made to evidentiary harpoons any error is deemed waived and cannot be raised for the first time on appeal").

24. *Bruner v. State*, 612 P.2d 1375, 1378–79 (Okl. Cr.1980).

Because the comment was invited by counsel, the comment does not constitute plain error.[25]

¶ 27 Torres alleges three evidentiary errors in his eighth proposition of error. First, Torres objects to Joyce Gilchrist's testimony regarding blood sample evidence. Torres did not object to Gilchrist's testimony at trial and he did not object to the admission of Exhibits 44, 52, 55 or 68. We review for plain error.

¶ 28 On direct examination, Ms. Gilchrist testified that the blood found on Torres' shirt was consistent with the blood of "Morales Soto,"[26] and was also consistent with blood of both Ochoa and Torres.[27] Torres claims that on direct examination Gilchrist testified only that Morales' blood was consistent with the stain on Torres' shirt. This claim is incorrect. At the end of direct examination, Gilchrist testified that the blood on Torres' shirt was consistent with the blood of all three men. In addition, during cross-examination, counsel again pointed out that the blood on the shirt was consistent with the blood of all three men. Gilchrist also testified that blood found on a fence near the victim's house was consistent with the defendants' blood.

¶ 29 Torres complains this evidence was not probative and should not have been admitted.[28] Although the probative value evidence of the blood on Torres' shirt is arguably weak, the admission of the evidence did not prejudice Torres. Since there is no prejudice, plain error did not occur. The evidence of the blood on the fence had a stronger probative value as it tended to place Torres near the crime scene. Admission of that evidence was not plain error.

¶ 30 Alternatively, Torres argues trial counsel's failure to object constituted ineffective assistance of counsel. However, since Torres was not prejudiced by the evidence, trial counsel was not ineffective in failing to object.[29]

¶ 31 Next, Torres contends the trial court erred in allowing Officer Coats to testify about post-arrest remarks made by Torres. Officer Coats testified that after their arrest, Torres and Ochoa were taken to the police station and separated. Coats testified:

Q. (MR. MACY) What did defendant Torres say in your presence?

A. (OFFICER COATS) As I observed him sitting at the desk, he would look down, look up at the ceiling (indicating), he would shake his head from side to side, and approximately eight times he shake his head say shit, shit, shit (indicating), approximately eight times.

Q. Did he say anything else to you?

A. He asked—after that, he asked when he was going to be booked. And later he made the statement I believe he was thirsty and tired.

Q. Were those the only statements made in your presence?

A. Yes, they were.[30]

Torres objected to this testimony on the grounds of hearsay and stated that the statement was not a statement against interest and it might be misconstrued. Counsel also expressed concern about use of the word "shit." The court overruled the objection and allowed the testimony.

¶ 32 Although Torres urges that admission of this evidence is reversible error, he fails to cite any authority to support this claim. It is the defendant's obligation to cite authority to support his claims on appeal and we will not provide that authority for him.[31]

25. *Mahorney v. State*, 664 P.2d 1042, 1045 (Okl. Cr.1983) (finding "no error in the question asked to the appellant's brother on cross-examination since the question was invited by defense counsel's line of questioning on direct examination").

26. Tr. Vol. VII at 165. By "Morales Soto" Gilchrist is referring to Francisco Morales, the male victim.

27. *Id.* at 173.

28. *See* 12 O.S.1991, §§ 2401–03.

29. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

30. Tr. Vol. V at 118–19.

31. *VanWoundenberg v. State*, 720 P.2d 328, 335 (Okl.Cr.1986) ("defendant must cite relevant and specific authority to support his assertions on appeal"); *Wolfenbarger v. State*, 710 P.2d 114,

Moreover, we find Torres' statements to be relevant and admissible. We also find it hard to believe that the use of the word "shit" would so shock the jurors as to influence their verdict. Accordingly, we conclude that the probative value of the evidence outweighed its prejudicial effect and the trial court did not err in allowing the testimony.[32]

¶ 33 Third, Torres objects to the admission of Exhibits 105–09 and 111–123, which were crime scene photographs of both victims. At trial, Torres raised a continuing objection to the use of color photographs as opposed to black and white photographs. He did not object on any other grounds.

¶ 34 The State introduced eighteen pictures of the victims' bodies. The decision to admit photographs rests within the sound discretion of the trial court.[33] "The test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice."[34] Moreover, "[t]he probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the corpus delicti, depicting the crime scene, and corroborating the medical examiner's testimony."[35] Here, exhibits 105–09 and 111–123 are probative of the nature and extent of the wounds, corroborating the medical examiner's testimony, depicting the crime scene and establishing corpus delicti. The trial court did not abuse its discretion in admitting the color photographs.

¶ 35 Finally, Torres argues that the cumulative effect of the errors discussed under this proposition warrants reversal. As we find no error, relief is not warranted.

¶ 36 Torres claims the evidence is insufficient to support his convictions for murder and burglary in his tenth proposition of error. The State proceeded under the theory that Torres aided and abetted in the commission of the crimes and that Ochoa was most likely the triggerman. To convict Torres as a principal for malice murder, "the State [has] to establish either that he directly committed each element of first degree malice murder or that he aided and abetted another in its commission."[36] "Aiding and abetting in a crime requires the State to show that the accused procured the crime to be done, or aided, assisted, abetted, advised or encouraged the commission of the crime."[37] This Court has stated repeatedly that "only slight participation is needed to change a person's status from mere spectator into an aider and abettor."[38] Moreover, "in a malice murder case the State must prove the aider and abettor personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator."[39]

¶ 37 The evidence supports a finding that Torres and Ochoa parked a car a few blocks from the Yanez/Morales home shortly before the murders. One witness identified Ochoa as one of the men in the car. She could not identify the other man but stated that that other man took a gun from the trunk of the car and put the gun in his waist band. The gun was not a Tech–9, which was the gun used in the killings. Christina Yanez testified that after hearing a number of gunshots and after she called 911, she looked out into the living room and saw Torres and

116 (Okl.Cr.1985) ("where an appellant cites no authority for his assignments of error, we will not search the books for him").

32. 12 O.S.1991, §§ 2401–03.

33. *McCormick v. State*, 845 P.2d 896, 898 (Okl. Cr.1993).

34. *Hooks v. State*, 862 P.2d 1273, 1280 (Okl.Cr. 1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).

35. *Trice v. State*, 853 P.2d 203, 212–13 (Okl.Cr.), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

36. *Spears v. State*, 900 P.2d 431, 438 (Okl.Cr.), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). *See* 21 O.S.1991, § 172.

37. *Spears*, 900 P.2d at 438.

38. *Id.*

39. *Johnson v. State*, 928 P.2d 309, 315 (Okl.Cr. 1996).

Ochoa standing together. Christina testified that Ochoa was holding something in his hand, but she could not identify what it was. Torres and Ochoa were talking and moving back and forth. Both men were arrested together shortly after the killings and only a few blocks away from the killings. Torres had blood on his clothing which was consistent with his blood, Ochoa's blood and victim Morales' blood. A footprint consistent with Torres' footprint was found a short distance from the Yanez/Morales home. The front door of the Yanez/Morales house looked like it had been kicked in.

¶ 38 Obviously, Torres illegally entered the Yanez/Morales home with Ochoa. Torres was more than merely present at the crime scene. The circumstantial evidence supports a finding of intent, particularly given the evidence that Torres had a gun with him prior to the killings and that he illegally entered the Yanez/Morales home.[40] "Where there is evidence to support the verdict, we will not disturb the jury's findings since it is the exclusive province of the jury to weigh the evidence and determine the facts."[41] This proposition is denied.

¶ 39 In Proposition XI, Torres complains that the trial court's instructions on aiding and abetting were defective. This Court has held that "in a malice murder case the State must prove the aider and abettor personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator."[42] "Aiding and abetting in a crime requires the State to show that the accused procured the crime to

be done, or aided, assisted, abetted, advised or encouraged the commission of the crime."[43] Moreover, while mere presence does not constitute a criminal act, "only slight participation is needed to change a person's status from mere spectator into an aider and abettor."[44]

¶ 40 Torres argues that Jury Instructions 11–12, which are identical to the standard Oklahoma Uniform Jury Instructions 1st ed. (OUJI–CR 1st ed.) on aiding and abetting,[45] did not adequately set forth the elements of aiding and abetting in a malice murder case.[46] Torres contends the standard aiding and abetting instructions replace the specific intent to kill in a malice murder case with a general criminal intent, thus, lessening the State's burden of proof.

¶ 41 The question here—the appropriate aiding and abetting instructions in a malice murder case—was answered in *Johnson v. State*.[47] Like Torres, the appellant in *Johnson* complained that the trial court erred in using the Oklahoma Uniform Instructions on aiding and abetting in a first degree malice murder case. Like Torres, Johnson argued the instructions allowed the jury to replace a general intent with a specific intent to kill thus lessening or changing the State's burden of proof. The *Johnson* Court rejected this argument finding that these instructions in conjunction with the instructions on first degree murder properly set out Oklahoma law and channeled the jury's discretion. *Johnson* controls here. Accordingly, we find the instructions in Torres' case properly set forth the law, did not diminish the State's

**40.** Torres cites *Sanders/Miller v. Logan*, 710 F.2d 645, 646–47 (10th Cir.1983) and *Anderson v. State*, 66 Okl.Cr. 291, 91 P.2d 794 (1939). These cases are distinguishable because in them the courts found there was no evidence to support premeditated design to kill. Here, Torres' actions can support a finding of intent as discussed in *Johnson v. State*, 928 P.2d 309, 315 (Okl.Cr. 1996).

**41.** *McBrain v. State*, 763 P.2d 121, 124 (Okl.Cr. 1988).

**42.** *Johnson v. State*, 928 P.2d 309, 315 (Okl.Cr. 1996). *Accord Cannon v. State*, 904 P.2d 89, 100 (Okl.Cr.), *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996); *but see Conover v. State*, 933 P.2d 904, 914–16 (Okl.Cr.1997).

**43.** *Spears v. State*, 900 P.2d 431, 438 (Okl.Cr.) (citations omitted), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995).

**44.** *Id.*

**45.** OUJI–CR 1st ed. 204–05.

**46.** The trial court used the OUJI–CR 1st ed., which went into effect in 1981. About a month after Ochoa's trial, this Court issued the revised OUJI–CR 2d ed.

**47.** 928 P.2d 309, 315–16 (Okl.Cr.1996).

burden of proof and adequately channeled the jury's discretion. Plain error did not occur.

¶ 42 Torres also complains because the instructions do not set out separate aiding and abetting instructions for murder and burglary. We find the instructions are not misleading or confusing, and relief is not warranted.

■ ¶ 43 In his twelfth proposition of error, Torres argues that Jury Instruction 6 is erroneous. Jury Instruction 6 instructed Torres' jury that:

No person may be convicted of Murder in the First Degree unless his conduct caused the death of the person allegedly killed. A death is caused by conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous or destroys life.[48]

There was no objection to the instruction; we review for plain error.

¶ 44 As Torres points out, the comments to OUJI–CR 1st ed. 426—which is essentially the same as Instruction 6 in this case—recommend the instruction only be given when the actual cause of death is disputed. The State concedes that the facts of this case do not warrant giving the instruction. In *Smith v. State*[49] a similar error occurred. There, despite finding error, the Court found that "[t]he instructions, when read as a whole, accurately state the applicable law and preclude the possibility that the jury may have believed it appropriate to convict Appellant of first degree murder absent a finding of intent."[50] Likewise, here the instruction did not confuse the jury as to its role or lessen the State's burden of proof. Torres has failed to show how he was burdened by such an instruction. There was no plain error.

## Prosecutorial Misconduct

■ ¶ 45 In his sixth proposition of error, Torres alleges that the prosecutor engaged in misconduct during both the first and second stage of trial. First, Torres complains that the prosecutor committed reversible error when he tried to impeach Maria Cauldron's testimony with her prior testimony taken at the mistrial. Ochoa objected and the objection was sustained. Neither Ochoa nor Torres asked for further admonishment or moved for a mistrial. The trial court cured the error by sustaining the objection.[51] Relief is denied.

¶ 46 Torres next contends that the prosecution committed reversible error in both the first and second stages of trial. At trial, Torres failed to object to many of the comments now raised as errors on appeal. Torres has waived such objections. Other comments about which Torres now complains fall within the broad parameters of effective advocacy and do not constitute error. Nonetheless, several of the prosecutor's comments warrant closer examination.

■ ¶ 47 During first stage closing argument, the prosecutor argued: "All I've got to say is why do you think we're asking you to convict? Do you think we're trying to prosecute somebody that's innocent?"[52] Torres objected to the comment stating "there is a presumption of innocence."[53] The trial court stated, "That's correct, but—proceed."[54] In *Miller v. State*,[55] the Court found it was fundamental error for the prosecutor to state in closing argument that "[the cloak of innocence has] been ripped away from him by the testimony of three men—four men, actually. [The defendant] stands guilty as charged."[56] Likewise, in *Hamilton*

**48.** Vol. III O.R. at 573.

**49.** 932 P.2d 521, 533–534 (Okl.Cr.1996).

**50.** *Id.* at 534. *See Sadler v. State,* 846 P.2d 377, 387 (Okl.Cr.1993).

**51.** *Woodruff v. State,* 846 P.2d 1124, 1140 (Okl. Cr.) (in reviewing prosecutorial misconduct claims, Court has found that sustaining objection by trial court cures error), *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

**52.** Vol. VIII Tr. at 185.

**53.** *Id.*

**54.** *Id.*

**55.** 843 P.2d 389 (Okl.Cr.1992).

**56.** *Id.* at 390.

**18**

*v. State*,[57] the Court found it error for the prosecutor to state that the cloak of innocence had been stripped from the defendant; however, the Court found the error harmless. Here, although the prosecutor did not use the phrase "cloak of innocence," his rhetorical question that he would not prosecute an innocent man impermissibly treaded on Torres' presumption of innocence. Such argument cannot be condoned. Nonetheless, like in *Hamilton*, the comment did not affect the verdict and relief is not warranted.

¶ 48 In second stage closing argument, the prosecutor argued that if the jury sentenced the defendants to a term of imprisonment the defendants would have food and shelter while the victims "lie cold in their graves."[58] This Court has condemned similar arguments by the same prosecutor,[59] and we continue to do so here. Nonetheless, there was no objection to the comment and we can not say that the comment constituted plain error. The prosecutor also overstated the gang evidence and argued that the motive for the killings was to gain higher status in the gang. The evidence did not support this claim. In addition, the prosecutor improperly pleaded with the jury to do justice "and the only way you can do that is bring back a sentence of death."[60] He also told the jury "If this isn't a death penalty case, what is?"[61] It is error for a prosecutor to refer to facts not in evidence and it is error for the prosecutor to state his personal opinion as to the appropriateness of the death penalty.[62] We are disturbed that the prosecutor risked reversal on appeal by employing such improper tactics. However, Torres has failed to show that the comments affected the

outcome of his case and we find the errors harmless.

### Ineffective Assistance of Counsel

¶ 49 In his ninth proposition of error, Torres claims trial counsel was ineffective. The standard for reviewing claims of ineffective assistance of counsel is well-established and was set out by the Supreme Court in *Strickland v. Washington*.[63] In *Strickland*, the Court set out a two-part test for reviewing claims of ineffective assistance of counsel:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[64]

¶ 50 Torres raises a number of complaints about trial counsel's performance that allegedly demonstrate that counsel was ineffective under *Strickland*. At the outset, Torres complains that trial counsel was ineffective in failing to object to Christina Yanez's identification of him as one of the intruders. In making this claim, Torres argues counsel

**57.** 937 P.2d 1001, 1009–10 (Okl.Cr.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 716, 139 L.Ed.2d 657 (1998).

**58.** Vol. X Tr. at 286–87.

**59.** *Duckett v. State*, 919 P.2d 7, 19 (Okl.Cr.1995).

**60.** Vol. X Tr. at 301.

**61.** *Id.* at 297.

**62.** *McCarty v. State*, 765 P.2d 1215, 1221 (Okl.Cr. 1988) ("Mr. Macy improperly expressed his per-

sonal opinion as to the death penalty by stating, 'this defendant deserves it ... This is a proper case for the death penalty ... and justice demands it.' Such argument was not based on evidence supporting any alleged aggravating circumstance, but was simply a statement of Mr. Macy's personal opinion as to the appropriateness of the death penalty and, as such, was clearly improper.")

**63.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**64.** *Id.* at 687, 104 S.Ct. at 2064.

was ineffective because she failed to obtain a transcript of the mistrial that would have been vital to counsel's attack on Yanez's identification.

¶ 51 Second, Torres claims that trial counsel was ineffective in failing to move to suppress Christina Yanez's identification of him. Torres asserts that Christina's identification was so tainted and unreliable that had trial counsel objected to her identification the trial court would have been compelled to suppress the identification. Although Christina initially denied knowing the men who killed her parents, she explained that she was frightened and that is why she denied recognizing the men. The initial denial does not render Christina's subsequent identification inadmissible; the evidence merely goes to the issue of credibility and reliability, which was a proper issue for the jury to decide.[65]

¶ 52 However, Torres claims that Christina's identification was so unreliable and suspect that as a matter of law it should have been suppressed. This Court has stated that an identification is admissible "as long as it was reliable under the 'totality of the circumstances.'"[66] The Court has opined:

> Since the danger sought to be avoided is misidentification due to the suggestiveness of the lineup, the factors to be considered in determining the reliability of the subsequent in-court identification focus upon the quality of the witness's observations before the lineup occurred. These factors include: opportunity of the witness to view the criminal at the time of the crime; witness's degree of attention; accuracy of witness's prior description of the criminal; level of certainty demonstrated by witness at the time of the confrontation; and

length of time between crime and confrontation.[67]

¶ 53 In connection with his claim, Torres repeatedly states that Christina first identified him at trial, which was held over two years after the incident. This is incorrect. At the preliminary hearing, which was held four months after Christina's mother and step-father were killed, Christina identified both Ochoa and Torres as the men who were in her home the night of the murders. At the preliminary hearing, Christina also indicated that she had identified Torres to police officers prior to her preliminary hearing testimony, although it is unclear when she first identified Torres to the police.[68] Thus, at the very least, Christina identified Torres four months after the killings. The four month delay in identifying Torres does not render Christina's identification inadmissible.

¶ 54 Torres also implies that improper police tactics or suggestive circumstances tainted Christina's identification. The record simply does not support this claim. Christina describes leaving her house and meeting with police officers after the homicides. There is no evidence that she saw either defendant prior to telling Officer Mullenix at the police station that Ochoa was one of the men she saw in her home that night and there is no evidence that Officer Mullenix told her who the suspects were. Torres has simply not shown that improper police actions or some type of an improper "show-up" identification occurred.

¶ 55 Moreover, there is ample evidence supporting the accuracy of Christina's identification. Christina saw the two men in her parents home the night of the murders. The men had turned on a light in the living

**65.** *See Woodruff v. State*, 846 P.2d 1124, 1134 (Okl.Cr.), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993) (jury is exclusive judge of weight of evidence and credibility of witnesses). *Cf. Snow v. State*, 876 P.2d 291, 295 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995) (noting cautionary instruction on eye-witness identification was not necessary and instructing jury that it was sole judge of witness credibility was proper).

**66.** *Tibbetts v. State*, 778 P.2d 925, 928 (Okl.Cr. 1989), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**67.** *Id.*

**68.** In her preliminary hearing testimony, Christina seems to indicate that she identified Torres and Ochoa in an interview with Officer Mullenix. This interview was conducted only hours after the shootings. At trial, Christina stated she only named Ochoa at that time.

room and Christina saw them in that light. Her description of Ochoa's clothing matches her brother's description, and her description of both men's clothing matches the clothing the men were wearing when they were arrested shortly after the murders. Although she initially denied knowing the men, she stated her denial was made out of fear. Since identifying the defendants, Christina's identification has been unwavering. We find, based on the totality of circumstances, that Christina's identification was properly admitted,[69] and Torres was not prejudiced by counsel's failure to object to the evidence.[70]

¶ 56 In addition, Torres argues that trial counsel was ineffective because she failed to retain eyewitness identification experts to challenge Christina's identification. Torres cites *United States v. Downing*.[71] In *Downing*, the Third Circuit held that expert testimony regarding witness identification is admissible but contingent on the trial court's determination that the evidence is reliable and not misleading.[72] He also cites *United States v. Smith*,[73] in which the Sixth Circuit found that it was error to exclude expert testimony on eyewitness identification but concluded that the error was harmless.[74]

¶ 57 While it might be that expert testimony regarding eyewitness identification would have been admissible in this case, Torres has not presented any evidence to show what that expert testimony would have revealed and he has failed to show how the failure to present such expert evidence preju-

diced him. Because Torres has failed to show he was prejudiced, we find trial counsel was not ineffective.

¶ 58 Finally, Torres claims that trial counsel was ineffective in failing to test the blood found on Torres' shirt. However, Joyce Gilchrist testified that the blood sample taken from Torres' shirt had been "consumed in the analysis" and she could not run further tests on it.[75] It also appears that all the blood found on Torres' pants and belt had been consumed in the analysis[76] and that Gilchrist was not able to do further PGM subtype testing on these articles of clothing. Trial counsel was not ineffective in failing to do further testing that was impossible. Accordingly, this claim is denied.[77]

### Capital Sentencing Issues

¶ 59 Torres contends in his thirteenth proposition that the trial court erred in failing to give second stage instructions that would focus the jury's attention on the individual culpability of each defendant. Specifically, he states that the trial court should have given an *Enmund/Tison*[78] instruction. However, in *Cannon v. State*,[79] this Court found that an *Enmund/Tison* instruction is not required in the second stage of a malice murder case where the jury has been instructed properly during the first stage of trial on aiding and abetting and the elements of first degree malice murder. *Cannon* controls here.[80] In the first stage of trial, Torres' jury was properly instructed on

---

**69.** *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Tibbetts v. State*, 778 P.2d 925, 928–29 (Okl.Cr.1989).

**70.** Torres also complains about Rebecca Castaneda's identification of the defendants. However, Torres has failed to show that the admission of that identification was error or that trial counsel was ineffective.

**71.** 753 F.2d 1224, 1226 (3d Cir.1985).

**72.** *Id.* at 1226.

**73.** 736 F.2d 1103, 1107 (6th Cir.) (per curiam), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984).

**74.** *Id.* at 1107.

**75.** Tr. Vol. VII at 165.

**76.** *Id.* at 173.

**77.** In connection with his claim of ineffective assistance of counsel, Torres also seeks an evidentiary hearing. We find that an evidentiary hearing is not warranted and deny Torres' request.

**78.** *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

**79.** 904 P.2d 89, 104–05 (Okl.Cr.1995).

**80.** Torres urges this Court to abandon our holding in *Cannon* on this issue. We decline to do so.

the elements of first degree malice murder and on aiding and abetting. In accordance with *Cannon*, we find that the trial court did not err in declining to give an *Enmund/Tison* instruction in the second stage of Torres' trial.

¶ 60  Torres' fourteenth and fifteenth propositions of error concern the continuing threat aggravating circumstance used to support his death sentence. In Proposition XIV, Torres argues the trial court erred in allowing evidence of his gang affiliation to be introduced to prove continuing threat. In Proposition XV, Torres argues the evidence was insufficient to support the jury's finding that he posed a continuing threat to society. These two propositions are closely related, and we consider them together.

¶ 61  Oklahoma provides that the death penalty may be considered an appropriate punishment for first degree murder only in certain specific cases, which are narrowly defined by statutory aggravating circumstances.[81] At issue here is the continuing threat aggravating circumstance which Oklahoma defines as "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[82] To prove this aggravating circumstance, the State relied on (1) the facts of the crime itself, (2) Torres' affiliation with the Southside Locos, a local gang, and (3) a prior unadjudicated juvenile burglary offense.

¶ 62  Torres argues that admission of evidence of his gang affiliation was error. First, he asserts that admission of the gang evidence violated *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[83] and *Taylor v. State.*[84] 12 O.S.1991, § 2702 provides "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." In *Taylor v. State,* the Court considered whether DNA evidence was admissible under § 2702. The Court noted that the Supreme Court in *Daubert* had recently changed the standard for evaluating the admissibility of scientific evidence under Federal Rule of Evidence 702. This Court adopted the *Daubert* standard stating "*Daubert* makes clear that trial judges must continue to act as gatekeepers, ensuring that all novel scientific evidence is both reliable and relevant."[85] In accordance with *Daubert, Taylor* held that the trial court should hold "a pretrial *Daubert* hearing . . . to determine whether such evidence is sufficiently 'reliable' and 'relevant' to warrant admission."[86]

¶ 63  In Torres' case, Officer Flowers testified extensively about gangs and the Southside Locos, the gang with which Torres was supposed to be affiliated. The trial court did not hold a pre-trial *Daubert* hearing prior to Flowers' testimony. It simply conducted a hearing in which Flowers testified to his credentials and experience, but not the reliability of his testimony. The court allowed Flowers' testimony on gangs. We find that *Taylor* is not applicable here and the trial court did not err in allowing the officer's testimony. In reaching this conclusion, we find the Texas Court of Appeals decision in *Nations v. State*[87] instructive. In *Nations*, the Texas Court of Appeals ruled that the trial court should have admitted expert eyewitness identification testimony, because such testimony concerned "specialized knowledge" as opposed to "scientific knowledge." After a thorough and lengthy analysis, the Texas court concluded *Daubert* should not apply to areas of specialized knowledge.

¶ 64  In reviewing *Taylor*, it is evident that *Taylor* applied *Daubert* to novel or new "scientific or technical evidence,"[88] but *Taylor* did not extend *Daubert* to specialized

---

81.  21 O.S.1991, § 701.12.

82.  21 O.S.1991, § 701.12(7).

83.  509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

84.  889 P.2d 319, 329–30 (Okl.Cr.1995).

85.  *Id.* at 329.

86.  *Id.* at 339 (footnotes omitted).

87.  944 S.W.2d 795 (Tex.App.1997).

88.  *Taylor,* 889 P.2d at 339.

or non-scientific evidence. Accordingly, we agree with the analysis in *Nations,* which we find consistent with *Taylor,* and hold that *Taylor* and *Daubert* are not applicable to non-scientific evidence, including testimony on the nature and structure of street gangs.[89]

¶ 65 Torres next argues that admission of the gang evidence violated the First and Fourteenth Amendments of the federal constitution and violated the Supreme Court's ruling in *Dawson v. Delaware.*[90] In his majority opinion in *Dawson,* Chief Justice Rhenquist held that "the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding."[91] Although the Court recognized "the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs,"[92] the Court rejected Dawson's claim that evidence of his membership in the Aryan Brotherhood was per se inadmissible.

¶ 66 In finding evidence of Dawson's membership in the Aryan Brotherhood to be improper, the Court appears to have been particularly struck by two facts: (1) the Aryan Brotherhood evidence was not connected to the murder of Dawson's victim, who was white; and (2) the prosecution failed to prove that the Aryan Brotherhood was involved in any criminal activity. Rather, at issue in *Dawson* was simply the following stipulation: " 'The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.' "[93] Without any other evidence of criminal activity, Dawson's membership in the Aryan

Brotherhood simply showed he was a racist and/or a member of a racist organization, and that alone is not proper evidence. Nonetheless, the Court did not close the door to all evidence relating to a defendant's associations. The Court noted, "In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future."[94]

¶ 67 Here, at issue is Torres' membership in the Southside Locos. In contrast to *Dawson,* the State not only introduced evidence of Torres' membership in the gang, but also introduced evidence that the Southside Locos engaged in criminal activity ranging from graffiti to drug trafficking to murder. This type of membership in a criminal gang is the type of associational evidence that the Supreme Court viewed as relevant and permissible in *Dawson.*

¶ 68 The next question is, however, what does Torres' membership in or affiliation with the Southside Locos mean in the overall scheme of the continuing threat aggravating circumstance. There is no evidence that the murders of Maria Yanez or Francisco Morales were connected to the gang or done on behalf of or to earn status in the gang. Indeed, the State in its brief explicitly states "No motive was ever discerned for the crime and it appears the Morales' home may have been picked at random."[95] Further, although the State introduced evidence that the Southside Locos engaged in a variety of criminal activities, the State failed to explicitly tie Torres to these criminal activities. Officer Flowers offered the closest connection that the State made

89. *See Bryan v. State,* 935 P.2d 338, 360 (Okl.Cr. 1997) (finding not plain error under *Daubert* to admit "scientific procedure for lead composition comparison" of bullets as this type of analysis did not amount "to a novel scientific procedure which would trigger *Daubert* scrutiny").

90. 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

91. *Id.* at 161, 112 S.Ct. at 1095.

92. *Id.* at 162, 112 S.Ct. at 1096.

93. *Id.* at 162, 112 S.Ct. at 1096.

94. *Id.* at 166, 112 S.Ct. at 1098.

95. St. Br. at 63.

between Torres and the Southside Locos' criminal activity. Officer Flowers testified that he investigated two drive-by shootings that occurred on April 11, 1993 at Sergio's, a local club. Torres was in Sergio's when the shooting occurred, and Torres' car was damaged as a result of the drive-by shootings. After the shootings, Torres told Flowers that he was a member of the Southside Locos. He also told Flowers that when the second vehicle went by, people inside Sergio's returned fire. Torres refused to identify any of the shooters and he did not claim responsibility for the shootings. Although Flowers found a clip from a semi-automatic in Torres' pocket, Flowers did not arrest Torres in connection with the shooting and no one, including Torres, was ever charged or prosecuted in connection with the incident. This incident reveals that Torres was at a club which was a target of a drive-by shooting; it does not reveal, however, whether Torres himself engaged in any criminal activity in connection with the shooting. The State offered nothing else to show the nature, extent or value of Torres' relationship with the gang. While the State's evidence shows that Torres is a member of the Southside Locos and shows that he was present at the scene of a drive-by shooting, it does not show what, if any, criminal acts Torres committed on behalf of or for the benefit of the Southside Locos. Such lack of connection between the gang's criminal activity and Torres makes the gang evidence, while admissible, of very marginal value as to the question of whether Torres himself poses a continuing threat to society. The limited nature of this evidence thus begs the next question: is the evidence sufficient to support the continuing threat aggravating circumstance. The answer is no.

¶ 69 Other than the gang evidence, the only evidence offered by the State to prove continuing threat was the circumstances of the murders and an unadjudicated juvenile burglary offense. When Torres was thirteen or fourteen years old, he and some other individuals burglarized a home taking a VCR and some guns. Torres and his father cooperated with the police in the investigation of the burglary and eventually all the stolen items were recovered.

¶ 70 This Court has stated evidence of prior criminal acts must "focus on only those crimes which indicate the likelihood of future violence."[96] The Court has found that non-violent unadjudicated offenses, such as burglary, are insufficient to prove continuing threat. In *Cudjo v. State*,[97] the Court found "Appellant's criminal history does not support the finding of this [continuing threat] aggravating circumstance. Although Appellant had admittedly burglarized the grocery store on prior occasions, these unadjudicated burglaries appear to have amounted to nothing more than petty thefts." In contrast, in those cases in which this Court has relied upon unadjudicated offenses to support continuing threat, the unadjudicated offenses involved violence.[98]

96. *Medlock v. State*, 887 P.2d 1333, 1346 (Okl.Cr. 1994) (quoting *Berget v. State*, 824 P.2d 364, 375 (Okl.Cr.1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992)).

97. 925 P.2d 895, 902 (Okl.Cr.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 863 (1997).

98. *See Charm v. State*, 924 P.2d 754, 763 (Okl.Cr. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997) (continuing threat supported by unadjudicated criminal acts occurring after murder including robbery, threatening to kill store clerk and stealing car); *Bryan v. State*, 935 P.2d 338, 361 (Okl.Cr.1997) (supporting continuing threat was defendant's previous conviction for solicitation for murder and unadjudicated violent acts); *Smith v. State*, 932 P.2d 521, 536 (Okl.Cr.1996) (supporting continuing threat was conviction for assault and battery with dangerous weapon, history of spousal abuse and

expert testimony of defendant's inability to control his rage); *Johnson v. State*, 928 P.2d 309, 318 (Okl.Cr.1996) (supporting continuing threat were previous unadjudicated threats of violence against wife and prior threats of imposing vigilante justice); *Allen v. State*, 923 P.2d 613, 621 (Okl.Cr.1996), *vacated on other grounds*, —— U.S. ——, 117 S.Ct. 1551, 137 L.Ed.2d 699 (1997) (supporting continuing threat was prior convictions for pointing weapon, history of violent arguments with wife and girlfriend, and attempt to kill police officer after killing victim); *Duckett v. State*, 922 P.2d 631, 633–34 (Okl.Cr.1996) (continuing threat supported by unadjudicated offenses including brutal attack and robbery of man who provided defendant with food and shelter); *Cannon*, 904 P.2d 89, 106 (Okl.Cr.1995) (continuing threat supported by unadjudicated violent criminal act committed contemporaneously with murder); *LaFevers v. State*, 897 P.2d 292, 307 (Okl.Cr.1995), *cert. denied*, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996)

¶ 71 Likewise in other cases in which this Court has found the evidence sufficient to support the continuing threat aggravating circumstance, the State has introduced evidence of prior criminal acts of violence [99] or evidence of violent criminal activity occurring after the crime.[100] An instructive case is *Malone v. State.*[101] In *Malone*, to support the continuing threat aggravating circumstance, the State introduced evidence that nineteen years before the current case, the defendant had been charged with shooting with intent to kill. The Court found that prior charge to be too remote and concluded that the State failed to prove continuing threat. In *Perry v. State*[102] the Court found the evidence insufficient to support continuing threat where the only evidence introduced to support this aggravating circumstance was (1) a witness' belief that Perry would kill him if he testified against Perry, and (2) the circumstances of the crime. The Court concluded, "At most, the State proved

an isolated act of violence committed by a man who suffered from severe drug and alcohol abuse. To establish 'continuing threat' the State must show 'a pattern of criminal conduct that will likely continue in the future.' "[103]

¶ 72 Here, the State showed that Torres belonged to a street gang and showed that Torres had a prior non-violent unadjudicated juvenile offense. Moreover, while the murders of Yanez and Morales were deplorable, the State's theory, which is supported by the evidence, shows that Torres was not the shooter. Under these facts, the State has presented insufficient evidence to show a pattern of criminal conduct that will likely continue in the future. Absent this proof, we cannot say that Torres poses a continuing threat to society.

¶ 73 Having found that the State failed to prove the continuing threat aggravating circumstance, "this Court has

(continuing threat supported by unadjudicated crimes of violence and threats of violence); *Cooper v. State*, 889 P.2d 293, 314 (Okl.Cr.1995) (continuing threat supported by unadjudicated prior murder); *Hooker*, 887 P.2d 1351, 1365 (Okl.Cr.1994) (continuing threat supported by unadjudicated past violent attacks on decedent); *Revilla v. State*, 877 P.2d 1143, 1156 (Okl.Cr. 1994), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995) (continuing threat supported by unadjudicated threats of violence); *Hogan*, 877 P.2d 1157, 1162 (Okl.Cr.1994) (continuing threat supported by unadjudicated lewd molestation, shooting out store windows and threats); *Roberts v. State*, 868 P.2d 712, 718–19 (Okl.Cr.), *cert. denied*, 513 U.S. 855, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994) (continuing threat supported by twenty prior acts of rape and burglary); *Robedeaux v. State*, 866 P.2d 417, 435–36 (Okl.Cr.1993), *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994) (continuing threat supported by unadjudicated verbal and physical attacks on decedent's children and physical attacks on others); *Boyd v. State*, 839 P.2d 1363, 1375 (Okl.Cr.1992), *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993) (continuing threat supported by armed robbery and unadjudicated resisting arrest); *Walker v. State*, 826 P.2d 1002, 1007 (Okl.Cr. 1992) (continuing threat supported by unadjudicated rape); *Williamson v. State*, 812 P.2d 384, 405–06 (Okl.Cr.1991) (continuing threat supported by unadjudicated acts of violence); *Boltz v. State*, 806 P.2d 1117, 1124 (Okl.Cr.1991), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991) (continuing threat supported by unadjudicated burglary occurring after murder

indicating defendant intended to kill wife and previous threat to kill wife); *Johnson v. State*, 731 P.2d 993, 1002–03 (Okl.Cr.1987) (continuing threat supported by prior unadjudicated acts of violence); *Newsted v. State*, 720 P.2d 734, 738 (Okl.Cr.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) (continuing threat supported by three unadjudicated murders).

**99** .*See e.g. Bryan*, 935 P.2d at 361 (supporting continuing threat was defendant's previous conviction for solicitation for murder and other unadjudicated bad acts); *Smith*, 932 P.2d at 536 (supporting continuing threat was conviction for assault and battery with dangerous weapon, history of spousal abuse and expert testimony of defendant's inability to control his rage); *Allen*, 923 P.2d at 621 (supporting continuing threat was prior convictions for pointing weapon, history of violent arguments with wife and girlfriend, and *attempt to kill police officer after killing victim*).

**100.** *See e.g. Charm*, 924 P.2d at 763 (finding criminal activity occurring after murder sufficient to support continuing threat); *Allen*, 923 P.2d at 621 (supporting continuing threat was prior convictions for pointing weapon, history of violent arguments with wife and girlfriend, and attempt to kill police officer after killing victim).

**101.** 876 P.2d 707, 717 (Okl.Cr.1994).

**102.** 893 P.2d 521, 536 (Okl.Cr.1995).

**103.** *Id.* at 536.

the authority to reweigh any remaining aggravating circumstances against the mitigating evidence to determine the validity of the death sentence." [104] This brings us to Proposition XVI in which Torres argues that the evidence is insufficient to support the second aggravating circumstance that Torres created a great risk of death to more than one person. We disagree. Torres and Ochoa killed two people. Under our case law, the killing of two people is sufficient to satisfy this aggravating circumstance.[105] Accordingly, the evidence is sufficient to sustain this aggravating circumstance.

■■■ ¶ 74 We now must weigh the mitigating evidence against the remaining aggravating circumstance and determine whether to sustain Torres' death sentence. In mitigation, Torres offered his youth at the time of the crime, his lack of a criminal record, his lack of a violent criminal history, his personal history and artistic ability, the love of his family and their support of him, and his degree of participation in the murders was less than that of co-defendant Ochoa. Torres' family also pleaded for mercy. While Torres' evidence had compelling aspects, we find, on balance that the aggravating evidence of the murder of two people outweighs the mitigating evidence. Accordingly, we sustain Torres' death sentence.

■■■ ¶ 75 In Proposition XVII, Torres argues the trial court committed reversible error when it modified the text of Torres' requested instructions on mitigating evidence. A defendant must be permitted to present all relevant mitigating evidence in support of his plea for a sentence less than

death.[106] Here, the trial court did not alter the substance of Torres' requested instruction when it modified the mitigating evidence instruction. Torres had an opportunity to present mitigating evidence and did present a good deal of evidence in support of mitigation. The court's instructions adequately reflect the mitigating evidence and the trial court did not abuse its discretion in modifying Torres' requested instruction. Error did not occur.

¶ 76 In his eighteenth proposition, Torres contends that the mitigating evidence outweighed the aggravating evidence in this case. The Court has already addressed this issue when it re-weighed the mitigating and aggravating evidence in this case and found that the evidence supported the death penalty. Accordingly, Proposition XVIII is denied.

¶ 77 In his final proposition of error, Torres presents many of the standard death penalty objections that are raised in most capital cases and which this Court routinely rejects. These claims are: (1) the jury instructions failed to inform the jury the findings for mitigation do not have to be unanimous;[107] (2) the mitigation instructions were defective;[108] (3) the trial court failed to tell jurors they could consider life or life without parole even if they found an aggravating circumstance;[109] (4) the weighing instructions were improper;[110] (5) Oklahoma's death penalty is unconstitutional;[111] (6) the jury's special finding of facts in the second stage of trial was unconstitutional;[112] (7) the trial court refused to allow evidence on cost effectiveness;[113] (8) the trial court refused to

**104.** *Malone*, 876 P.2d at 718.

**105.** *Hooker v. State*, 887 P.2d 1351, 1364 (Okl.Cr. 1994), *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995).

**106.** *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978).

**107.** The Court rejected this claim in *Charm*, 924 P.2d at 772 n. 57.

**108.** *Id.*

**109.** The Court rejected this argument in *Harjo*, 882 P.2d 1067, 1081 (Okl.Cr.1994).

**110.** The Court rejected this argument in *Duckett*, 919 P.2d 7, 22 (Okl.Cr.1995).

**111.** The Court has held Oklahoma's death penalty is constitutional. *Hamilton*, 937 P.2d 1001, 1013 (Okl.Cr.1997).

**112.** The Court has rejected this argument. *Duckett*, 919 P.2d at 27.

**113.** The Court has found that it is not error to refuse to allow evidence on the cost effectiveness of the death penalty. *Smallwood v. State*, 907 P.2d 217, 233 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996).

instruct the jury on the presumption of life;[114] (9) the trial court denied Torres the right of allocution;[115] and (10) the prosecutorial charging discretion is unconstitutional.[116] Each of these issues has been raised in previous death penalty cases and rejected by the Court. We once again decline to grant relief on any of these issues.

## MANDATORY SENTENCE REVIEW

¶ 78 In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C). The jury found the existence of two aggravating circumstances: (1) continuing threat and (2) risk of death to more than one person. We found the evidence insufficient to support the continuing threat aggravating circumstance, but found the evidence sufficient to support the risk of death to more than one person. Accordingly, the Court re-weighs the mitigating and aggravating circumstance. Torres' mitigating evidence included: (1) his youth at the time of the crime, (2) his lack of a criminal record, (3) his lack of a violent criminal history, (4) his personal history and artistic ability, (5) the love of his family and their support of him, and (6) his degree of participation in the murders was less than that of co-defendant Ochoa. Torres' family also pleaded for mercy. After reweighing the evidence, we sustain Torres' death sentence. Finding no other error warranting modification, the judgment and sentence of Oklahoma County District Court is **AFFIRMED.**

STRUBHAR, V.P.J., and JOHNSON, J., concur.

LUMPKIN and LANE, JJ., concur in results.

LUMPKIN, Judge, concurs in results.

¶ 1 I concur in the results reached by the Court, however I cannot join in some of the verbiage used or unsupported conclusionary statements.

¶ 2 In it's discussion of Proposition III, the Court fails to recognize that co-defendant Ochoa's access to the crime scene prior to the second trial was due to an accommodation by the State. The Court recognizes that third parties occupied the home at that time and had denied Appellant's investigators access. The trial court recognized it did not have authority to direct the third parties to allow the defense investigators into the house. Somehow the State was able to secure permission to return to the house to take measurements and prepare a new diagram. While I agree it would have been more prudent for the State to allow the defense investigators for Ochoa the opportunity to confirm the new measurements, it was not error. In addition, this issue was raised by Ochoa at trial, not Appellant. Therefore, he has waived the issue for review on appeal.

¶ 3 The Court's discussion of Appellant's role as an aider and abettor seems to disregard our unanimous decision on that issue in *Conover v. State,* 933 P.2d 904, 914–16 (Okl. Cr.1997). Regretfully, the issue raised here is a product of one of the "potential 'time bombs'" I referred to in my separate writing in *Johnson v. State,* 928 P.2d 309, 321–22 (Okl.Cr.1996) (Lumpkin, J. Concurring in Result). Using the standard set out in *Conover,* I find the evidence sufficient to support the verdict in this case. The Court should follow our jurisprudence and not try to confuse it.

¶ 4 I also find the facts relating to the aggravator that Appellant knowingly created

---

**114.** The Court does not require courts to give an instruction on the presumption of life. *Duckett,* 919 P.2d at 22.

**115.** The Court does not require that courts grant the defendant the opportunity to make a personal plea of mercy to the jury. *Id.* at 20–22.

**116.** The Court has rejected similar claims on abuse of prosecutorial charging discretion. *Hooker,* 887 P.2d 1351, 1367–68 (Okl.Cr.1994).

a great risk of death to more than one person more compelling than related in the opinion. Appellant and his co-defendant, armed with firearms, entered the home of the victims, in a residential neighborhood, in the early morning hours of July 12, 1993. The front door of the residence was kicked in and the victims gunned down in their bedroom. Three children, ages six (6), eleven (11) and fourteen (14) years were in the house. Fortunately, those children did not run into the hallway. One child called 911 and asked for help. She looked out of her bedroom and saw two men, one she later identified as Appellant. Her stepbrother hid under his bed when he heard the shots. He later testified he saw a man shoot his father as he watched from under the bed. Not only does the murder of the two victims support the aggravator, but also the risk of death to the others who were in the home. This evidence relating to the aggravator not only substantiates the death penalty but also clearly outweighs the evidence presented in mitigation. I therefore concur in the result reached by the Court.